Iris Halpern*
Azra Taslimi*
Stephanie Wise*
Qusair Mohamedbhai
Rathod | Mohamedbhai LLC
2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
ih@rmlawyers.com
at@rmlawyers.com
sw@rmlawyers.com
qm@rmlawyers.com
*Attorneys for Plaintiff*

*\* Pro Hac Vice Applications Pending*

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| Plaintiff, | ) |
| | ) |
| TERRI LESLEY, an individual, | ) |
| v. | )    Case No. |
| | ) |
| Defendants, | ) |
| | ) |
| CAMPBELL COUNTY, a municipality; | ) |
| CAMPBELL COUNTY BOARD OF COMMISSIONERS; | ) |
| CAMPBELL COUNTY PUBLIC LIBRARY SYSTEM | ) |
| BOARD OF TRUSTEES; | ) |
| DEL SHELSTAD, in his individual capacity; | ) |
| COLLEEN FABER, in her individual capacity; | ) |
| SAGE BEAR, in her individual capacity; | ) |
| CHARLES BUTLER, in his individual capacity; | ) |
| CHELSIE COLLIER, in her individual capacity; and | ) |
| DARCY LYON, in her individual capacity. | ) |

## **COMPLAINT**

## <u>**INTRODUCTION**</u>

The First Amendment of the United States Constitution protects public libraries against

censorship.[1] When the government officials who administer public libraries restrict library

---

[1] The Supreme Court long ago confirmed the First Amendment right for persons to receive information and ideas, particularly in public libraries because "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (emphasis in original). This right to access ideas and content precludes any public library system from purging books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* (internal quotations omitted). Importantly, "the right to access to information" recognized by the Supreme Court in a case about public school libraries has "'even greater force when applied to public libraries,' since public libraries are 'designed for freewheeling inquiry,' and the type of discretion afforded to school boards is not

materials based on content or viewpoint, they violate the Constitution. Likewise, when such government officials make decisions based on prejudice and animus towards protected classes, they equally transgress the Fourteenth Amendment. These Constitutional protections ensure that public libraries remain civically integrated bastions of intellectual freedom and open discourse.

For more than twenty-seven years, Plaintiff Terri Lesley dedicated her life to the Campbell County Public Library System ("CCPLS"). Ms. Lesley was an extraordinary librarian, having served eleven of her twenty-seven years with CCPLS as its Executive Director, transforming CCPLS into a thriving hub of knowledge and community engagement. In 2021, however, the highly politicized vilification of LGBTQ+ communities and book-banning craze engulfing the country landed on her doorstep, with grave consequences. A few Campbell County residents began demanding that the Library Board and Board of Commissioners censor LGBTQ+ books modelled for children and young adults because LGBTQ+ individuals were "dangerous," and the books were "pornographic" and "obscene." A small fraction of the community espoused openly homophobic, transphobic, and other hateful ideologies. For approximately two years, these residents relentlessly and maliciously mischaracterized Ms. Lesley as engaging in illegal activities and threatened her during public meetings of the Board of Commissioners and Library Board.

Instead of rejecting this campaign of fear and hate, Defendants aligned themselves with it. Defendants consciously sought to alienate LGBTQ+ individuals from CCPLS, acquiescing and further disseminating the message that LGBTQ+ individuals are dangerous, abnormal, unwelcome, and their voices should be suppressed. A well-organized book-ban campaign arose, during which participants, including a few vocal residents, Library Board Members, and County

---

implicated.'" *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *8 (W.D. Tex. Mar. 30, 2023) (omitting internal quotations).

Commissioners targeted Ms. Lesley for advocating for the rights of LGBTQ+ individuals in a full range of library services, and for refusing to remove the challenged books from the shelves. Defendants continually subjected Ms. Lesley to a hostile work environment and ultimately terminated her because she refused to remove the books that a narrow subset of residents challenged for their LGBTQ+ themes and because she engaged with, welcomed, and did not discriminate against LGBTQ+ individuals in access to CCPLS, CCPLS contracts, and CCPLS services. Their actions not only devastated Ms. Lesley professionally and personally, but also undermined the very mission of CCPLS and inflicted harm on the broader community. For this, they must be held responsible.

## JURISDICTION, VENUE, AND PARTIES

1.      This action is authorized and instituted under the Constitution and laws of the United States pursuant to Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e et seq. and 42 U.S.C. §§ 1983 and 1985. Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper in the District of Wyoming pursuant to 28 U.S.C § 1391(b). All Defendants reside within and/or perform official duties within the state of Wyoming. This Court, accordingly, has personal jurisdiction over each Defendant.

3.      At all times relevant hereto, Terri Lesley was a citizen of the United States and a resident of the State of Wyoming.

4.      Terri Lesley is a resident of Gillette, Wyoming, a city located within the predominantly rural Campbell County located in northeastern Wyoming.

5.      Defendant Campbell County is a municipality in the State of Wyoming. Defendant Campbell County performs official functions related to public libraries through Defendant Campbell County Board of Commissioners.

6.      Campbell County Public Library System ("CCPLS") is a department of Campbell County and includes two public libraries: (1) the main library, which is the Campbell County Public Library ("Campbell Branch") located in Gillette; and (2) the Wright Branch Library ("Wright Branch") located in Wright.

7.      CCPLS's finances are controlled as revenues and expenditures within the Campbell County budget, and its employees are Campbell County employees.

8.      Defendant Campbell County Board of Commissioners ("Board of Commissioners") is the governing body of Campbell County and oversees CCPLS.

9.      In exercising authority over CCPLS, the Board of Commissioners performs official functions through the Campbell County Public Library System Board of Trustees ("Library Board") and acts as the final policymaker for Defendant Campbell County.

10.      The Board of Commissioners is comprised of five elected County Commissioners and has the authority to approve Campbell County's budget.

11.      At all relevant times, Defendants Del Shelstad and Colleen Faber served as County Commissioners. The Board of Commissioners elected Defendant Shelstad as Chair on January 6, 2022. The Board of Commissioners elected Defendant Faber as Chair on January 4, 2023. Both are residents of the State of Wyoming.

12.      The Board of Commissioners appoints citizens to serve on twenty-three Campbell County boards, including the Library Board.

13.     The Library Board is comprised of five members who are limited to serving two three-year terms.

14.     The Library Board sets CCPLS policies and appoints the CCPLS Executive Director.

15.     The Board of Commissioners appointed Defendant Sage Bear to the Library Board on April 5, 2022. She became Chair of the Library Board soon thereafter. She is a resident of the State of Wyoming.

16.     The Board of Commissioners appointed Defendant Charles "Chuck" Butler to the Library Board on July 6, 2022. The Library Board elected him as Chair on July 24, 2023. He is a resident of the State of Wyoming.

17.     The Board of Commissioners appointed Defendant Chelsie Collier to the Library Board on July 6, 2022. The Library Board elected her as Vice Chair on July 24, 2023. She is a resident of the State of Wyoming.

18.     The Board of Commissioners appointed Defendant Darcy Lyon to the Library Board on August 2, 2022. She is a resident of the State of Wyoming.

19.     The Campbell County website states that the CCPLS Executive Director "serves at the pleasure of the" Library Board, which is "responsible to" the Board of Commissioners.

20.     The Board of Commissioners, on behalf of Campbell County, oversees and controls the Library Board, CCPLS, and the CCPLS Executive Director and is the final policymaker for all financial, employment, and policy decisions.

## ADMINISTRATIVE EXHAUSTION

21.     Ms. Lesley filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 27, 2023.

22.    The Charge of Discrimination included allegations under Title VII of the Civil Rights Act of 1964 for sex discrimination, hostile work environment, and retaliation on the basis of association, advocacy, and engaging in protected activities.

23.    Ms. Lesley received a Notice of Right to Sue enabling her to bring her Title VII claims in federal court on February 3, 2025.

24.    Ms. Lesley filed this lawsuit within 90 days of receipt of her Notice of Right to Sue.

## FACTUAL ALLEGATIONS

### *Terri Lesley's Career at CCPLS and Promotion to Executive Director*

25.    Ms. Lesley moved to Gillette, Wyoming with her family when she was in second grade.

26.    She graduated from Campbell County High School in 1981 and then earned her Bachelor of Science in business administration and marketing from the University of Wyoming in 1985.

27.    After graduating, Ms. Lesley originally worked for CCPLS in a marketing role.

28.    CCPLS hired Ms. Lesley as a librarian in 1996.

29.    As she would continue to do throughout her career, Ms. Lesley received overwhelmingly positive performance evaluations as a librarian.

30.    Upon entering the field of librarianship, Ms. Lesley made it her mission to create an inclusive and welcoming environment at CCPLS.

31.    She actively sought out books and materials that celebrated diversity, and she organized events that celebrated various cultures and perspectives.

32.    She reached out to underserved communities, ensuring that they had access to CCPLS's resources and services.

33.    Ms. Lesley assisted patrons in their quests for knowledge, emphasizing the importance of understanding different viewpoints and embracing diversity.

34.    In 2003, Marcia Wright, the Executive Director of CCPLS, retired, and Ms. Lesley was named interim director.

35.    At that time, Ms. Patty Myers was hired as Executive Director, and she encouraged Ms. Lesley to get her master's degree in library science.

36.    In addition to working at CCPLS, Ms. Lesley served her community as a member of CCPLS's management team, holding the position of Senior Financial Specialist. In that role, she oversaw and helped organize two major construction projects, the building of the Wright Branch, which opened in 2003, and a remodel of the Campbell Branch in 2007.

37.    Ms. Lesley earned her master's degree in library science from the University of North Texas in 2012.

38.    Shortly thereafter, Ms. Myers retired, and Ms. Lesley was promoted to CCPLS Executive Director in April 2013.

39.    After her promotion, Ms. Lesley continued demonstrating her commitment to being a leader in her community. For example, she graduated from the Leadership Wyoming Class in 2020, served as the Secretary/Treasurer of the Wyoming Council for Women, and was a member on the Wyoming State Library Governing Board.

40.    Ms. Lesley held the position of CCPLS Executive Director for about eleven years, until Defendants terminated her on July 28, 2023.

41.    Ms. Lesley's last years at CCPLS were punctuated with local and national awards showcasing her impact on her community. For example:

   a.    On December 31, 2021, Ms. Lesley was recognized as one of *Gillette News Record*'s Annual "Ten Who Made a Difference" for her stewardship of CCPLS

during the unrest of the previous six months, "standing firm with a marginalized and misunderstood minority of the community and upholding the democratic ideals that serve as the backbone of all public libraries."

b. On June 24, 2022, Ms. Lesley received the American Library Association Intellectual Freedom Round Table's 2022 John Phillip Immroth Memorial Award, which "honors the courage, dedication, and contribution of a living individual, group, or organization who has set the finest kind of example for the defense and furtherance of the principles of intellectual freedom."

42. Ms. Lesley travelled to Washington D.C. to accept her award from the American Library Association. In her acceptance speech, Ms. Lesley spoke about the importance of the First Amendment and standing up against oppression.

43. Ms. Lesley understood the immeasurable importance of her role in the community she served for nearly three decades, a librarian's ability to facilitate access to information is a key tenet of democracy, innovation, and the preservation of history. Moreover, she understood that an especially important part of this role was to provide patrons with content by and representative of marginalized groups.

### *Evidencing Prejudice, County Commissioners Express Opposition to Pride Month*

44. Unfortunately, Ms. Lesley's dedication to her community was cut short.

45. In 2021, the wave of controversial book banning and other attempts to censor literature engulfing the country landed on Ms. Lesley's doorstep.

46. During the 2021-22 school year, over 1,600 book titles were banned in the United States according to PEN America.[2]

---

[2] PEN America, *Banned in the USA: The Mounting Pressure to Censor*, https://pen.org/report/book-bans-pressure-to-censor/.

47.    In 2022 the number of attempts to ban books rose to 1,269 demands targeting 2,571 unique titles – a 38% increase from the year before and a record since the American Library Association ("ALA") started collecting censorship data over twenty years ago.[3]

48.    By the end of 2023 the numbers deteriorated further, culminating in challenges of 4,240 unique books titles in schools and libraries across the country – a 65% increase from the year before.[4]

49.    This alarming trend is particularly focused on young adult books dealing with race, gender, and sexual identity.[5] Nearly 50% of books targeted involved LGBTQ+ content or the voices or experiences of individuals of color.[6]

50.    Pro-censorship individuals or groups seeking to impose subjective political, religious, or moral agendas on their communities are driving the surge, demanding censorship of dozens and even hundreds of titles at once.[7]

---

[3] American Library Association, https://www.ala.org/news/press-releases/2023/03/record-book-bans-2022.

[4] ALA, https://www.ala.org/news/2024/03/american-library-association-reports-record-number-unique-book-titles.

[5] ALA, https://www.ala.org/advocacy/bbooks/book-ban-data.

[6] ALA, https://www.ala.org/news/2024/03/american-library-association-reports-record-number-unique-book-titles.

[7] ALA, https://www.ala.org/news/2024/03/american-library-association-reports-record-number-unique-book-titles.



*Daniel Arkin, NBC NEWS, More than half of 2023's most challenged books have LGBTQ themes (April 9, 2024)*
https://www.nbcnews.com/nbc-out/out-news/banned-books-lgbtq-library-association-rcna146236

51.     Examples of such organizations include MassResistance, an organization which coordinates campaigns across the country targeting LGBTQ+ and racially diverse content and communities.[8]

52.     In Campbell County, the campaign to remove literature started during Pride Month in 2021 when County Commissioners – Defendants Shelstad and Faber – adopted an antagonistic stance towards a Facebook post advising viewers of books featuring LGBTQ+ ideas and narratives in the CCPLS's youth collection.

53.     Thereafter, Defendants Shelstad and Faber orchestrated a book-ban campaign and targeted Ms. Lesley for two years because of her advocacy and association with the LGBTQ+ community and for opposing discriminatory practices.

54.     The campaign began on the evening of June 28, 2021, during Pride month.

---

[8] Andrew Limbong, *New Report Finds a Coordinated Rise in Attempted Book Bans*, NPR, https://www.npr.org/2022/09/19/1123156201/new-report-finds-a-coordinated-rise-in-attempted-book-bans

55.    Two days prior, a CCPLS employee had posted on Facebook that "June is Pride Month and Rainbow Book Month," with a link to the CCPLS young adult blog.

56.    On June 28, 2021, Genevieve Schlekeway, CCPLS's public relations coordinator, texted Ms. Lesley, informing her that Defendant Shelstad commented on the Facebook post, critiquing the promotion of Pride Month and Rainbow Book Month by complaining that the County had not designated those dates.



57.     Defendant Shelstad's Facebook comment surprised Ms. Lesley because the Board of Commissioners appoints Library Board members and approves the CCPLS budget but is not typically involved in daily operations.

58.     Ms. Lesley planned to email Defendant Shelstad the following day.

59.     Before she could respond, Defendants Shelstad and Faber emailed Ms. Lesley on June 29, 2021, expressing concerns about the LGBTQ+ Facebook post.

60.     In his email to Ms. Lesley, Defendant Shelstad expressed hostility towards LGBTQ+ community members and CCPLS patrons, claiming he was "disturbed" by the post, and that: "I believe that teaching this kind of behavior to minors is up to the parents not the government. It also suggests that we are giving special treatment to a certain group."

61.     Defendant Faber's email to Ms. Lesley likewise stated: "I . . . also received some messages regarding the teen room advertisement regarding Pride Month . . . I know there is concern related to the aspect of our teens being minors and I would like to see this type of information and topics be a discussion between parents/families."

62.     Ms. Lesley replied to both and forwarded the messages to the Library Board.

63.     In her responses, Ms. Lesley clarified that Pride Month and Rainbow Book Month are national designations. She explained, "The post supports the library mission to provide diverse cultural opportunities for reading, learning and entertainment to all citizens of our community."

64.     Ms. Lesley reached out to the Library Board and found that not only did no Library Board member have any concerns with the Facebook post or young adult blog, but the Library Board was supportive of her efforts.

65.     At that time, the Library Board was composed of the following five members:[9]

    a.  Dr. Hollie Stewart (Chair), a pediatrician;

    b.  Charlie Anderson, former City of Gillette attorney;

    c.  Miranda Miller-Finn, an assistant English professor;

    d.  Nancy Stovall, a retired engineering manager; and,

    e.  Mandy Steward, newly-appointed.

66.     Ms. Lesley hoped this would put the matter to rest, however, this was not to be the case.

67.     Ms. Lesley heard no complaints or opposition from any CCPLS patrons regarding Pride Month and Rainbow Book Month until July 7, 2021, when Commissioner Daniel G. ("D.G.") Reardon unexpectedly requested by email with few other details that she join the Board of Commissioners meeting that same day.

### *The Board of Commissioners Interrogates Ms. Lesley about CCPLS Support of Pride Month*

68.     The controversy over LGBTQ+ themed books escalated on July 7, 2021.

69.     Commissioner Reardon asked Ms. Lesley to come to the Board of Commissioners meeting that day to "help" him because, "We have some folks showing up on this Library PRIDE month that we are going to need your help explaining."

70.     This request seemed coordinated with censorship activists, given the nature and vagueness of the request and the suddenness with which it was sprung on Ms. Lesley.

71.     The ALA has recognized Rainbow Book Month since 2015, and there had never been complaints or concerns with CCPLS support until 2021.

---

[9] Apart from Mr. Anderson, the composition of the Library Board entirely changed between the summer of 2021 when it supported Ms. Lesley and the LGBTQ+ community and the summer of 2023 when every Library Board member except Mr. Anderson voted to terminate Ms. Lesley.

72.     The following individuals were on the Board of Commissioners on July 7, 2021: Defendants Shelstad and Faber, D.G. Reardon, Rusty Bell, and Robert Maul.

73.     During Public Comments, a few Campbell County residents expressed opposition to Pride Month and Rainbow Book Month and began asking the Board of Commissioners to move books that centered around the experiences of LGBTQ+ people from the children and young adult collections into the adult collection, arguing, wrongly, that the books were "pornographic" and "inappropriate" for minors.

74.     Three of these residents were Hugh Bennett, Susan Bennett, and Kevin Bennet. The Bennetts, like Defendant Shelstad, made little effort to conceal their discriminatory sentiments against LGBTQ+ individuals, only nominally veiling their animus by suggesting they were protecting children, and even then, suggestively stereotyping the LGBTQ+ community.

75.     Hugh Bennett described Pride Month as "immoral," "perverted," and an "attack on family" going so far as to label it "wicked:"

> "What we're looking at here is the ground game of an attempt to destroy our culture and our country . . . I believe what we're seeing is a demoralization of the United States of America . . . what you're looking at right here is a promotion of immorality and perversion. I think it's pretty easy to figure out what sex you are. And people who control information in our society . . . it's an attack on the basic family structure because the basic family structure is the one thing that's the strongest that resists government and wars and immorality and losing the will to go on . . . this is an assault on our morals, our ethics, our heritage, our belief in God. . . a lot of this is really subtle and wicked in its intimidation by authority figures of our most vulnerable people in society – our teens and preteens . . . we have laws about perversion and sex before somebody comes of age and it could be argued that what they're doing is pandering to minors' immorality . . . ultimately, it can lead to suicide."

76.     Kevin Bennett described Pride Month as "pedophilic" and made claims about child molestation occurring in public:

> "Never have I seen heterosexuality in teenagers encouraged for an entire month at the public level and we know why . . . if we're not encouraging heterosexuality among teenagers under the age of eighteen, up to nineteen I suppose, for a month in the public

library, we definitely should not be doing that with sexual identities that are known to cause suicide and HIV. That's just common sense. In fact, there's an argument to be made that there's a pedophilic nature to the sort of governance that would encourage that and not bat an eye when it comes . . . you have to take a book like The Babysitters' Coven . . the people that are involved in these departments, which push this agenda do prey on young people . . . In Austin, Tatiana Mala Nina, a convicted child molester, dressed in drag and danced at child story time. Not in the teen section, but in the children's section of the Austin, Texas library . . . That's happening there because they had an LGBTIA teen month for a few years until it became inured in the community to the point where people didn't even bat an eye, and then child molesters are out there playing with your children in public in broad daylight . . . I've known three people who committed suicide. One of them, Richard Kennedy, from Cheyenne, WY made a transition a few years ago . . . he was not a very attractive young man. He was not a very attractive young lady. And everybody told him he was bold and brave, and he knew deep down they were lying to him. And he killed himself. It wasn't because of the bigots that he killed himself. It was because of the people who share this agenda that he killed himself. And he's not the only one. So what this is doing is sowing seeds of suicide, drug addiction, domestic violence, you can look at the statistics. And it shouldn't be in our community . . . it's coming here if we don't stop it. There are going to be people who die that didn't have to."

77.     Susan Bennett urged the Board of Commissioners to consider disciplinary measures

against the Library Board:

"What's happened at the library . . . if I had a child that was a kleptomaniac, I'm not going to educate everybody about why my child is a kleptomaniac and teach them how they do it and why they do it. Then the next thing you're gonna see is other kleptomaniacs coming out of the closet. If you have an issue in life and a behavior in life, We love everyone. We accept everyone. But that doesn't mean we have to teach them the behavior and promote it. That's their issue. We will support them and we will get around them but it doesn't mean that is a normal behavior or that is the way we were created or the way we should go forward. All of this coming out of the closet and everything has gotten way out of hand . . . we should have a moral compass and we all know what that moral compass is. we know where all the laws of the land have come from the beginning of our existence and we need to go back to see what that says. We need to have a moral compass . . . we have seen the increase in suicide, we have seen the increase of miserable human beings out there, Antifa and the Black Lives Matters and all this . . . We need to do the responsible and moral thing . . . I want to encourage you to look at that board, at the Library Board and at the very least give them some discipline as to what they did because they did not represent our community in June . . . it's time to address it."

78.     The Bennetts and other activist residents voiced explicit anti-LGBTQ+ rationales

for their requests to remove books, virulently vilifying LGBTQ+ individuals. They invoked

degrading and hostile stereotypes of the LGBTQ+ population at large, framing them as predatory towards youth, while alleging that any allyship or support for such individuals or voices was criminal.[10]  At the Board of Commissioners meeting on July 7, 2021, for example:

   a. One resident testified that "We have a friend with a twelve-year-old daughter . . . she's decided that she's polysexual . . . Our children are being bombarded with sexual terms such as asexual, intersexual, bisexual, polysexual. Her mother is beside herself trying to figure out how to help this child and guide her in the right direction when all these other voices are pulling her in the wrong direction. Our library does not and should not be promoting these ideas in the minds of these young, very impressionable children."

   b. Hugh Bennett argued, "a lot of this is really subtle and wicked in its intimidation by authority figures of our most vulnerable people in society, our teens and preteens . . . and it could be argued that what they're doing is pandering to minors' immorality . . . ultimately, it can lead to suicide."

   c. Kevin Bennett stated, "If we're not encouraging heterosexuality among teenagers . . . for a month in the public library, we definitely should not be doing that with sexual identities that are known to cause suicide and HIV . . . there's a pedophilic nature to the sort of governance that would encourage that . . . In Austin, Tatiana Mala Nina,[11] a convicted child molester, dressed in drag and danced at child story time . . . because they had an LGBTIA teen month for a few years until it became inured in the community to the point where people didn't even bat an eye, and then child molesters are out there playing with your children in public in broad daylight . . . it shouldn't be in our community . . . it's coming here if we don't stop it."

---

[10] To better understand the significance of this particular anti-LGBTQ+ discriminatory motivation, look no further than the example of the Proud Boys showing up armed to drag queen story hours at public libraries in Nevada, Texas, and California to "protect kids." Proud Boys, for example, held signs accusing attendees of "grooming" children, called parents "sick" for bringing their children, wore t-shirts that said "Kill your local pedophile," accused those reading stories of being "pedophiles" and "groomers," and referred to Pride Month as "groomer awareness month." At least one sheriff's office investigated those "protests" as hate crimes. Miller, Cassie, *Proud Boys Aid the Right-Wing Assault on the LGBTQ Community and Reproductive Justice*, Southern Poverty Law Center (July 13, 2022), https://www.splcenter.org/hatewatch/2022/07/13/proud-boys-aid-right-wing-assault-lgbtq-community-and-reproductive-justice.

[11] This rationale that one library somewhere missed identifying one performer who was a child sex offender does not mean all drag queens or LGBTQ+ people are child predators. Such an assumption peddles in stereotypes and is no different than saying because one man raped a woman that all men are rapists, or because one priest engaged in pedophilic behavior, all priests are pedophiles. No one argues that because one pastor is immoral that no pastors should be allowed into a library, or that all religious books should be banned from a library or school.

    d.    Another censorship advocate testified that, "I think our library should be promoting things that are wholesome, and build good character in kids, and not confusing with all these many sexual type directions that they could go in life . . . they're going to be experimenting with this stuff at way too young of an age just to fit in. It's really cool to be gay or different . . . it's just the demoralization of our nation."

    e.    Another resident advocating for the removal of books spoke derogatorily of LGBTQ+ individuals, calling them "the alphabet soup of LBGTQISG or whatever it is and then with a plus sign at the end, so you can add whatever it is that you want including pedophilia and all kinds of unimaginable things."

    f.    Scott Clem claimed, "We're promoting the basest of base things in our society . . . there's nothing virtuous about that . . . let's not promote animalistic behaviors."

79.    The Bennetts and other residents agitating for censorship and vilifying the LGBTQ+ community during the meeting specifically mentioned LGBTQ+ books.

80.    Of the four books mentioned by name in this Board of Commissioners meeting on July 7, 2021, three were LGBTQ+ themed: *A Quick & Easy Guide to Queer & Trans Identities* by Mady G and Jules Zuckerberg, *All Out: The No-Longer-Secret Stories of Queer Teens throughout the Ages* edited by Saundra Mitchell, and *Music from Another World* by Robin Talley.[12]

81.    In response to the comments, Ms. Lesley explained that CCLPS's mission was to provide diverse cultural opportunities for reading, learning, and entertainment to everyone in the community.

82.    Defendant Shelstad then asked Ms. Lesley if there was a "straight" section in the library or a "straight" month promoted at the library and said, "This is exactly the type of thing that I think is harmful in our community. I'm not asking you to have a straight pride month. I'm just asking you not to have a gay pride month."

---

[12] Depriving communities of access to their voices, history, stories, and reflective analysis comprises part of cultural genocide, a widely utilized strategy for rendering communities in visible and destroying them.

83.    After that, a resident explicitly asked the Board of Commissioners to replace all the members on the Library Board. According to her, "After hearing the Library Executive's position, I don't feel like she is being honest. I toured the teen room. It was dark. There was no diversity down there . . . we elected you guys to oversee this . . . And I again would request that everybody on the Library Board be removed. They've betrayed us."

84.    That afternoon, Commissioner Reardon emailed Ms. Lesley suggesting that the Campbell Branch just eliminate its entire teen section, merely because a few LGBTQ+ themed books were contained in the collection, stating, he was only concerned with the comment about the "dark" teen room having only "bad" books. "I would suggest you take a look at that. The only solution to that in my short sightedness would be to close that section of the library off and not have a teen specific area which I don't think is what the library wants to see."[13]

### County Commissioners Oppose a Transgender Magician Performing at the Library

85.    The situation continued to intensify when later that same day, on July 7, 2021, Defendant Shelstad emailed Ms. Lesley questioning the suitability of a magician CCPLS contracted to perform a magic show at the Campbell Branch the following week.

86.    Unbeknownst to CCPLS employees, the magician, who came highly recommended, was transgender.[14]

87.    Defendant Shelstad objected to the magic show at the library because the magician was transgender.

---

[13] Depriving an entire community of a valuable public benefit instead of providing diverse content is reminiscent of municipalities that chose to close their public swimming pools rather than integrate. *See Palmer v. Thompson*, 403 U.S. 217 (1971).

[14] While the magician's name is known, she does not share the personal information that she is transgender on her professional website. Out of respect for her safety, this Complaint keeps her anonymous and only refers to her as "the magician."

88.    Ms. Lesley defended the performance.

89.    Defendant Shelstad complained that "Doing a search of the magician [ ] shows this is a transgender act. I am not thinking this is a good idea. Taxpayer money going to things like this only upsets the tax payers of our County more."[15]

90.    Ms. Lesley replied, emphasizing that the magic show was "strictly a magician's show" and explaining that "the program was professionally recommended, highly reviewed, and the magician has performed for children at libraries all across the Midwest – on countless occasions – with no issues."

91.    In doing quick research on the magician, Ms. Lesley found no mention of her gender identity, and found that she had appeared on Penn and Tellers' TV Special *Try This at Home*, Travel Channel's *Magic Caught on Camera* series, had been featured on CNN and in publications like USA Today, and had travelled across the country performing magic shows for children in such venues as Six Flags and the Iowa State Fair.

92.    The following day, on July 8, 2021, a local pastor and former Wyoming State Representative, Scott Clem,[16] posted his objections about the "transgender magic show" on social media, sparking further controversy. He claimed the event may be a "cover to introduce and glorify something more insidious and harmful," "talk about sexual issues with our teens," and "exploit our kids to a sexual agenda like the library has been doing over the last month."

93.    That same day, Defendant Faber emailed Ms. Lesley, Defendant Shelstad, Commissioner Maul, and the Campbell County Executive Director of Administration, Carol

---

[15] It is unlawful for government entities to discriminate against someone based on sexual orientation or gender identity. Firing someone because of their transgender status violates Title VII. *See Bostock v. Clayton County, Georgia*, 140 S.Ct. 1731 (2020).

[16] On August 23, 2024, Scott Clem became a Campbell County Commissioner.

Seeger, with the subject line, "Parental Review Board – RE: Magic show," asking to "have a discussion of implementing a parental review board for our library."

94.     On July 11, 2021, an anonymous source sent Ms. Lesley screenshots of a group chat that included Defendants Shelstad and Faber colluding and conspiring with censorship activists to organize protests against LGBTQ+-related content and the magician's show.

95.     The screenshots showed Representative Clem, Defendants Shelstad and Faber, and other censorship activists discussing the strategy for the earlier public comments at the previous July 7, 2021, Board of Commissioners meeting, cancelling the magic show because the magician was transgender, and firing Ms. Lesley and the Library Board because CCPLS supported Pride Month:

   a.  **Resident 1:** ". . . The Library Board has overplayed their hand by promoting Pride Month without authorization from the County Commissioners. The commissioners elected the Library Board and they are not pleased with the Library's promotion of LBGTIA+ [sic] in June. Therefore, we have an open door to voice our disapproval of the library sponsoring perversion indoctrination. See in this link: https://ccpls.info/teens/ We are asking for 30-50 people to attend the County Commissioners meeting tomorrow at 9:00 in the Court House . . . we need you to stand up for the kids and push back against this blatant indoctrination that was unauthorized. If you want to speak, please prepare your 3 minute comment. You may also address one of the books in the link above. We will remind the commissioners that we love all people and do not hate anyone but the library is not free to indoctrinate children to a world view or sexuality . . . Homosexuals have repackaged and sold to the public behaviors which thousands of years of history, every major world religion and uncompromising human biology have long identified as immoral and sexually deviant . . ."

   b.  **Defendant Shelstad**: "Our commissioner meeting is Wednesday at 9:00"
       . . .

   c.  **Resident 1:** [Link to YouTube video about the magician's transition]

   d.  **Resident 3:** "I told Colleen [Commissioner Faber] last night to fire the person in charge of Library. If the library board won't act commissioner's [sic] have to send a clear message this won't be tolerated. Make it swift and decisive."
       . . .

e. **Defendant Faber**: "Working on a parental review board – some states have legislation regarding parental review boards and they have the power to fine the director and remove them. However, that board cannot be appointed by our current library board – that would completely defeat the purpose . . ."

f. **Resident 1**: "Everyone should go to the library like I did . . . We must have evidence to present to others who are not aware so we can get the library cleaned up . . ."

g. **Defendant Shelstad**: "Susan just please don't start trouble with the staff. Let us work on this."
. . .

h. **Resident 5**: ". . . having a transsexual entertaining children with "magic" is a predatory effort . . . This IS NOT innocent childhood play, it's sick. I'm very glad Del and Colleen are trying to stop it before we have a drag queen reading to children at story hour . . ."
. . .

i. **Resident 6**: "@Del Shelstad I guess I'm a little unclear on the goal at this point. Are we wanting to not allow pride month to be acknowledged or are we asking for no specific groups to be celebrated? Are we against the content in library or just the advertisement of specific content? Are we against the type of person who's doing the magic show or are we against the content within the magic show geared for young children . . ."

j. **Defendant Shelstad**: "No specific groups to be recognized. Our job is to protects [sic] all people's rights. It's really that simple."
. . .

k. **Resident 6**: "Ok. Step 1. No specific groups recognized or advertised . . ."
. . .

l. **Scott Clem**: ". . . The big reason why this thread was started was to make sure that doesn't happen with this transgender magic show next week. We already had a month when the library was actively promoting sexual material to teens."
. . .

m. **Resident 5**: "Got it . . . We need to run a hard email campaign where we all send individual messages to the commissioners and possibly the library board. I think it would be the wise to get ourselves all on the same page . . . The library brought him [the magician] in on our tax dollars without informing us. At all. And we have the video evidence this guy is a tranny.[17]  That should not be put in front of kids even

---

[17] The term "tranny" is often used in a defamatory manner and as a slur against transgender individuals "to humiliate and degrade" them. Bass, Lance, *Why We Shouldn't Use the Word*

if he's the most milquetoast performer on the planet, because it's a method of ideological subversion. It's grooming. Softening the kids up so they'll be more accepting of this perversion as they get older. No way around it. That lady [Ms. Lesley] at the meeting on Tuesday lied through her teeth as regards neutrality, the whole board needs to be fired, and I think there's a strong case to make that happen even twisting the arms of the liberal commissioners. I said there would be trannies doing entertainment at the library last week. I am flabbergasted that such events were less than a week out . . . She knew full well and pretended she was being neutral. That alone is against our community and our taxes, and in my view constitutes letting her and others with her go from the library board . . ."

n. **Resident 1**: "I love the strategy and I am all in!!!"

96.    The chat disclosed Defendants Shelstad's and Faber's involvement in orchestrating efforts with residents to ban certain library books, halt the magic show, and terminate Ms. Lesley because she advocated for the LGBTQ+ community and opposed discriminatory practices.

97.    If one resident's assertion that the County Commissioners were "not pleased with the Library's promotion of [Pride Month]" was incorrect, then Defendants Shelstad or Faber could have contradicted that statement.

98.    Neither Defendant Shelstad nor Defendant Faber contradicted that statement because that assertion was correct, Defendants Shelstad and Faber were not pleased with the Library's promotion of Pride Month.

99.    Defendant Shelstad selected the "No specific groups to be recognized" strategy because of its adverse effect on the LGBTQ+ community.

100.    Defendant Faber articulated her intent to create a parental review board to fire Ms. Lesley because CCPLS supported Pride Month and hired a transgender magician, and because Defendant Faber did not think the current Library Board would fire Ms. Lesley.

---

*'Tranny*,' HUFFPOST (Dec. 23, 2011), https://www.huffpost.com/entry/why-we-shouldnt-use-the-word-tranny_b_1168078.

101.    As the magic show neared, tensions escalated, and the Campbell Branch began to receive threats. An unknown person parked at the curb, entered the Campbell Branch, and delivered a warning to front desk staff that they better "cancel the program or else."

102.    Commissioner Maul reported receiving a threatening phone call regarding the magic show.

103.    The magician also reported receiving a threatening phone call and message from Gillette, Wyoming.

104.    Between July 11 and 13, 2021, Ms. Lesley reported all threats to the police department and made security arrangements for the magic show.

105.    On July 12, 2021, Commissioner Reardon emailed Ms. Lesley, misgendering the magician asking her to "please make sure that [the magician] knows the situation here and keeps his program to magic and leaves out anything that could be construed as LGBTQ? That would be most helpful."

106.    On July 12 and 13, 2021, Commissioner Reardon forwarded Ms. Lesley at least eight emails from Campbell County residents to County Commissioners. Largely, these emails contained LGBTQ+ animus and demanded the cancellation of the magic show because the transgender status of the magician:

   a.    One resident exhibiting overt hostility towards CCPLS contracting with transgender individuals stated, "I am not ok with the Library Board scheduling a show at our community library for someone who identifies as transgender."

   b.    Another resident, Susan Sisti, calling for CCPLS to discriminatorily exclude transgender individuals from programming argued, "We were expecting the commissioners to exercise proper oversight by relieving those complicit in approving and promoting sexual deviancy to our youth against the expectations of the majority of the Campbell County public … Ms. Terri Lesley, who represent the Campbell County Public Library at the recent meeting, was quick to say they did not have an agenda with the Gay Pride month geared toward our teens . . . what most of us would deem to be very inappropriate, unnecessary books . . . not even a

month later in July with **a transgender magician coming in to "educate" our children for a two-day scheduled event under the guise of 'entertainment.'"** (emphasis in original).

    c.   Another claimed, "The utilization of public money to advance the LGBTQ agenda at our local library is unacceptable. The LGBTQ community uses such events in an attempt to confuse children about their sexuality."

    d.   Hugh Bennett vociferated: "Word on the street is, a perverted cross dressing queer magician is coming to entertain children at the library this month to the little kids . . . Is it really wise to introduce small children to perverts and encourage a cross dressing queer to interact with elementary-aged children, or teenagers? . . . So please be advised, the commissioners' leadership or failure to exercise leadership in this case will very likely have political consequences at the next election."

    e.   A fifth resident claimed, "I am sending you this email to let you know how appalled I am that our Public Library would promote the LGBTQ lifestyle in this way! . . . to bring in a person who is going to influence our children like this is beyond my imagination! . . . If there is any way to stop this 'magic show', I would hope you would do your best to influence the library administration in any way you can."

    f.   A sixth resident expressing a desire to exclude LGBTQ+ people from library programming explained, "if this is a 'magician show' why are the LGBTQ+ people going to be in attendance at the library? They have not been in attendance for other summer programs."

    g.   Another resident argued that "the library is presenting a magic show by . . . a self identifying transvestite . . . What are we going to promote next? Pedophilia, prostitution, dog fighting, or whatever? I guess the sky's the limit. I respectfully request you cancel this show."

107.    Given the threats to her safety and animosity fomented against her by some of the Defendants' agents and several residents, the magician cancelled the magic show due to concerns for the safety of the children attending, CCPLS staff, and herself.

108.    Ms. Lesley issued a press release about the cancelled magic show.

109.    Despite the magic program being cancelled, a small number of protestors gathered outside the Campbell Branch on the day the magic show had been scheduled with posters such as,

"YOUR LIBRARY OK'S LGBTQ," "DON'T TRANS OUR KIDS" and "1% TAX PROMOTES LGBTQ."[18]



***County Commissioners Continue Voicing LGBTQ+ Animus and Discriminatory Intentions Alongside Residents***

110.    Although Defendant Shelstad stated the goal was for "No specific groups to be recognized," during the Board of Commissioners meeting on July 20, 2021, Campbell County residents again voiced explicit LGBTQ+ animus and discriminatory intentions, as well as associational and retaliatory animus against Ms. Lesley.

111.    At this monthly Board of Commissioners meeting, Kevin Bennet and Hugh Bennett spoke on the record as well.

112.    Kevin Bennett criticized the Board of Commissioners for the scheduling of the magician program solely because of the magician's gender identity and blamed Ms. Lesley for not uncovering the magician's gender identity earlier:

---

[18] This LBGTQ+ animus was the impetus behind the Board of Commissioners later withholding County funds for youth books and programs at the Campbell Branch and cutting the referenced "1% TAX" from Campbell Branch's budget in the FY 2022-23 County Budget.

A lot of performers let me tell right now you there's some perverted sons of guns. If Terri Lesley did no background check on this individual, how do we know that there haven't been no transexuals in this community before . . . what kind of political shenanigans are we hiding behind that we are bringing transsexualism into this community. There are people wearing rainbow flags, rainbow shirts back there…we are saying that tax dollars should not be spent in a way that puts children in situations of danger, and this Board was told about June Pride Month. I talked to all of you. I emailed all of you. Now, when we talked about that, we didn't know there was a transexual coming. Somebody at the library did and if they didn't, they dropped the ball. A dog guarding a hen house who lets the fox in is a bad guard dog. If he meant to do it, if he didn't mean to do it, it doesn't matter. That's a breach of the public trust and community endangerment.

113. Hugh Bennett urged the Board of Commissioners to wield their governmental authority and protect the children from what he referred to as "perversion."

114. Hugh Bennett further blamed Ms. Lesley for failing to disclose to the Library Board that the magician was transgender:

Right now there's a battle for the soul of America going on. . . you men are in positions of authority. Exercise it. What's the problem with protecting our children from perversion? . . . why aren't you doing anything? We've got a library director who was either unaware or unwilling to disclose at the last meeting that we had a transgender performer scheduled for our kids. Now. I don't know precisely what happened behind closed doors concerning that performer begin cancelled, but the narrative is that the performer cancelled itself. The performer cancelled his performance due to death threats, which is patently false. There's been no death threats, but that's what the media picked up. The people who want to pervert our kids love to paint themselves as victims who are misunderstood. Turn your back on them and see what happens.

115. After Public Comments, Defendants Faber and Shelstad exploited child protectionism language to mask their LGBTQ+ animus while invoking degrading stereotypes and manufacturing dangers associated with transgender individuals.

116. Defendant Faber explained "When a child's entertained by a successful entertainer like [the magician in question] they are inspired . . . they want to learn more about that person . . . they may go to YouTube and see videos that aren't appropriate for a child . . . I feel a great responsibility as a County Commissioner about protecting our children."

117.    Likewise, Defendant Shelstad, while pointedly misgendering the magician, said, "I took the liberty to call [the magician] . . . why can he say he is concerned about the kids, but the parents of Gillette cannot?"

***Defendants and Activists Continue to Pressure Ms. Lesley to Discriminate and Censor***

118.    Hugh Bennett authored an article in his business's print magazine, "Anybody's Autos," in which he discussed the magician's show and provided a detailed account of his efforts to advocate for its cancellation.

119.    Within the article, titled "Local Residents help SPIKE Taxpayer Funded Library's Transgender Performer," Ms. Lesley is mentioned by name no less than four times.

120.    The article accuses Ms. Lesley of failing to inform the Board of Commissioners about the magician's gender and of lying about the threats received against the library staff and the magician.

121.    Furthermore, the article criticizes the library for "circulating LGBTQIAP+ propaganda" and "targeting our children."

122.    In his article, Hugh Bennett acknowledged deploying strategies used by MassResistance in mobilizing opposition against specific library books and pressuring the library to cancel the magician's performance.

123.    MassResistance, an organization known for promoting virulently anti-LGBTQ views, gained notoriety after the Southern Poverty Law Center labeled it as a hate group.

124.    Its founder and president, based out of Massachusetts, continually links trans women to sexual predators and links homosexuality to pedophilia, violence, and disease.

125.    Kevin Bennett founded the MassResistance Wyoming chapter and organized a booth at the County Fair in August 2021 to actively recruit others to join in his family's censorship campaign.

126.    He not only encouraged attendees to become members of the local chapter but urged them to sign petitions advocating for the banning of LGBTQ+ themed books and estranging LGBTQ+ community members from the library system.

127.    Soon, electronic billboards paid for by MassResistance began appearing throughout Gillette, displaying messages such as "child indoctrination at our library" and "inappropriate youth books in the library."





128.    Defendants Shelstad and Faber, as well as defendants Sage Bear and Chelsie Collier, all joined the private Facebook group Wyoming MassResistance.

129.    The Bennetts were also members.

130.    Other Cambell County censorship activists were also members of the private Facebook group.

131.    Susan Sisi and Sarah Parker were two of those members.

132.    Susan Sisti and Sarah Parker  specifically requested that several books, including *Gender Queer*, be completely removed from all collections at the library, not just the section for young adults.

133.    The private Facebook group included MassResistance Field Director Arthur Schaper.

***County Commissioners Coordinate and Encourage the Onslaught of LGBTQ+ Animus and Retaliatory Sentiment***

134.    A Library Board meeting held on July 26, 2021, included a review of the CCPLS Collection Development Policy, which outlined the principles governing the selection and maintenance of books. Per the policy, staff used software and objective data such as durability, circulation statistics, budget constraints, patron demand, shelf space, literary merit, accuracy, and social significance.

135.    Given the nature of the books being attacked, Ms. Lesley repeatedly stated at public Library Board meetings between July 2021 and July 2023 that removing these books from the children and young adult collections would constitute censorship and was in violation of the First Amendment.

136.    Throughout that time, multiple attorneys shared legal analysis with the Library Board, Board of Commissioners, and Campbell County attesting to the same.

137.    Ms. Lesley believed removing these books was discriminatory towards members of the LGBTQ+ community.

138.    During the meeting, some residents vociferously criticized Ms. Lesley and the Library Board, accusing them of corrupting, grooming, and indoctrinating children while endangering children by promoting pedophilia.

139.    The next day, on July 27, 2021, in response to the vitriol against the LGBTQ+ community and those who supported them at these July meetings, the Board of Commissioners released a Statement on Tolerance and Anti-Discrimination:

**NEWS RELEASE**

**FOR IMMEDIATE RELEASE**

**CONTACT:**
Carol Seeger
Executive Director of Administration
(307) 682-7283
cjs06@ccgov.net
Date: July 27, 2021

### Campbell County Commission Statement on Tolerance and Anti-Discrimination

**Gillette, WY—** In the light of recent events and discourse surrounding the Campbell County Public Library, the Board of Campbell County Commissioners want to affirm that Campbell County government is committed in policy, practice and principal to fostering and maintaining an environment that respects every individual regardless of background, experience and culture and does not tolerate discrimination or harassment of any kind based on race, ethnicity, color, national origin, gender, sexual orientation, religion, age, disability, military status or any other protected class by applicable state or federal law. Campbell County policies include prohibitions on harassment and retaliation. This commitment extends to supporting a diverse and inclusive community where all views are appreciated and the Board welcomes the free and open comments from Campbell County citizens at the beginning of each of its regular meetings but speech and actions which are demeaning, disrespectful or violent will not be tolerated nor are the comments made by Campbell County citizens or individual members of the Board necessarily the views and opinions of the Board as a whole or Campbell County Government. We hope that the community can continue to be fully engaged but remember that each citizen is afforded the right to their own beliefs and that we must accept those differences.

### ###

140.     Despite that statement, Campbell County residents continued to repeatedly tell the Board of Commissioners their anti-LGBTQ+ discriminatory motivations behind requests to move books, change CCPLS policies, and terminate Ms. Lesley, arguing that exposure to LGBTQ+ individuals or themes violated "Christian," "conservative," and "moral" values.

141.     For example, at the August 3, 2021, Board of Commissioners meeting, Kevin Bennett offered a prayer for Commissioners Maul, Bell, and Reardon, beseeching them to repent or be removed from office.

142.     He demanded the same of Ms. Lesley, stating "Lord Jesus God, please remove her, recall her, put people in place that will take care of our children… keep this wickedness from happening."

143.    Susan Bennett also spoke at the meeting, accusing Ms. Lesley and others of "criminal offense," "putting our children in danger," of "child neglect," and arguing that Ms. Lesley and others were dangerously close to violating laws:

> Part of your oath is . . . to represent us . . . All I've seen since I was here last time is your legal discrimination statement . . . you are discriminating against latchkey children . . . this is not against intolerance or discrimination against LGBTQ+. This is about children and we need your support and your help to change the policies to look into the library policies that you appointed with trustees. Those beautiful girls that were here. They are not equipped to handle the materials, and we cannot go through every one of those books . . . we have to have policies in place that you're elected to put in place [leaving these books in place is a]. . criminal offense . . . legally, you are putting our children in danger . . . we need to be watching out for the children that don't have adequate traditional nuclear families . . . this is enticement, this is child neglect, and you guys be warned. There are law and you guys are very close to violating all of them.

144.    An email to the Board of Commissioners on August 5, 2021, accused Ms. Lesley and others of criminal sexual exploitation, describing how,

> Our Public Library is no longer a 'Safe Place' for minors . . . in the heterosexual community, access to similar sexually explicit material in public stores without showing identification of 18 years or older is not offered or pushed . . . Additionally those who have been convicted of sexually deviant behaviors, such as pedophilia are not allowed on public school property and are not allowed to be near children even to entertain . . . currently our public library administration is acting ignorantly and not in the best interest of our children or this community by providing and promoting such material . . . I wonder if this is actually looking dangerously more like child endangerment according to the Sexual Exploitation of Children Act W.S. 6-4-303 . . . Are our County Commissioners and Library administration and, or board of Trustees engaging in any way, shape or form in luring and enticing our children by distributing sexually explicit graphic inappropriate, harmful material by being indifferent, proud, negligent and, or apathetic by downplaying our warning or 'passing the buck' and disrespecting or ignoring our grievances in any way? I sure hope not.

145.    As Ms. Lesley had explained at the Library Board meeting on July 26, 2021, CCPLS had a policy in place for patrons who thought something should not be on a library shelf to challenge its place in the CCPLS collection—Request for Reconsideration of Library Materials ("Request Process").

146.    CCPLS received the first Request on August 11, 2021.

147.    The next day, on August 12, 2021, at a joint meeting of the Library Board and Board of Commissioners, Ms. Lesley explained the Collection Development Policy and the Request Process in detail.

148.    The CCPLS book reconsideration policy consisted of a series of steps:

a.    The first step requires a patron to find a librarian and explain what the patron finds objectionable with a book and why the patron believes the book should be removed from the library's collection.

b.    Next, the librarian works to resolve the patron's concerns through a verbal discussion.

c.    After that, if a satisfactory resolution cannot be reached, the patron is asked to submit his or her request in writing by completing the "Request for Reconsideration of Library Materials" form, which serves as the formal record of their complaint.

d.    Once completed, copies of this form are distributed to three key individuals: the library branch's executive director, the manager responsible for the specific collection containing the book, and the patron who initiated the request.

e.    Then, the collection manager reviews the patron's concerns, examines book reviews, and reads the book in question. Based on his or her assessment, the collection manager formulates a recommendation and composes an official response.

f.    This response, along with the recommendation, is reviewed by the executive director of the library. The executive director's role is to ensure that the process has been correctly followed and that the decision or recommendation aligns with library policies.

g.    After the executive director reviews the response, a letter is sent to the patron via mail. This letter conveys the library district's final decision or provides a recommendation for further action.

h.    Then, if the patron remains dissatisfied with the outcome, he or she has the option of requesting to discuss the determination further with the executive director, who attempts to address any lingering concerns and mediate a resolution.

i.    If the conversation with the executive director still does not bring about a satisfactory resolution, the patron has one last recourse. The patron can file an appeal with the Library Board, which holds the ultimate authority to decide whether a book will remain in the library branch's collection. The Library Board's decision marks the final chapter in the Request Process.

149.    Ms. Lesley encouraged community members to follow that established policy.

150.    At the meeting Ms. Lesley explained that CCPLS had not received any such Requests, except for one instance when a child asked a library manager about one of the *Diary of a Wimpy Kid* books.

151.    In fact, during her time as Executive Director, Ms. Lesley had never seen a Request progress beyond the manager's response until CCPLS started receiving anti-LGBTQ+ book challenges in 2021.

152.    Defendants Shelstad and Faber initially orchestrated their book-ban campaign using the Request Process.

153.    They even requested the removal of a book, but as discussed below, Ms. Lesley did not remove that book, and the Library Board did not grant Defendant Faber's appeal.

154.    Between August 11, 2021, and November 8, 2021, seventeen individuals officially submitted fifty-seven challenges against twenty-nine books.

155.    Seventeen of those books centered around the experiences of LGBTQ+ people.[19]

156.    Not one request was submitted from a parent whose child looked at or checked out a book the parent thought was inappropriate.

157.    Three of those seventeen individuals were Commissioner Maul and Defendants Faber and Shelstad. On August 16, 2021, each of those three County Commissioners submitted a request to remove *This Book is Gay* by Juno Dawson. This action was only five days after CCPLS received the first Request in a coordinated effort to remove primarily LGBTQ+ books from the CCPLS collection.

---

[19] One children's picture book was irrationally misconstrued to be about a transgender child and another book was already in the adult section.

158.    Each time, Ms. Lesley attempted to adhere to the Request Process. She began to review the challenged book.

159.    Nevertheless, at the Board of Commissioners meeting on August 17, 2021, Kevin Bennett claimed, "I'm here to address what seems to be illegal activity taking place . . . *This Book is Gay* by James Dawson encouraged enticement and that's not the only book among the materials in the library that do . . . [those responsible] fools should be removed from their positions and other people should be put in their place."

160.    On August 19, 2021, Ms. Lesley, Children's Director Darcy Acord, and the Board of Commissioners received an email from MassResistance Field Director Schaper demanding Ms. Lesley's resignation because its members "fight back against the outrageous, inappropriate, and destructive LGBT indoctrination making its way into the public libraries under your supervision."

161.    At the September 8, 2021, Board of Commissioners meeting, a Campbell County resident demanded that the Board of Commissioners "fire the director. They can fire the board . . . the power exists to do that. And it's not being done . . . what we're dealing with today isn't one of protecting a class of minorities. It's one of using politics to facilitate weakness . . . it's something that's been seen historically. The Greeks and the Romans had gay people, and their societies imploded . . . it's known historically that when this vice . . . becomes inherent to society, it destroys that society. We need to stop it. And those County Commissioners that will not stop it, your reputation is one of bringing gay porn to kids that could be stopped as easily as moving the books."

162.    Because their requests did not result in Ms. Lesley removing *This Book is Gay*, Defendants Shelstad and Faber publicly voiced their frustration, expectations, and intent to retaliate if Ms. Lesley and the Library Board did not censor LGBTQ+ books.

163.    At the September 21, 2021, Board of Commissioners meeting, Defendant Shelstad openly critiqued the Request Process because he did not get the result he wanted. He advocated for doing away with institutional safeguards and interjecting his personal politics into the process. He stated that he personally considered *This Book is Gay* to be "pornographic" and the response to his challenge to be "more cover your butt" than an explanation. According to him, leaving LGBTQ+ content on the shelves was "creating division" in the community and he "would hope" that the Library Board—whose members the Board of Commissioners appoints—would implement his personal politics and "make this issue better and not worse."

164.    Also at the September 21, 2021, meeting, Susan and Hugh Bennett distributed a document purportedly informing attendees about Wyoming rape laws and their application to the library's book collection.

165.    Hugh Bennett asked the Board of Commissioners to remove members of the Library Board because their actions conflicted with "state criminal statutes in Wyoming."

166.    Kevin Bennett called for the Board of Commissioners to hold those who declined to remove the challenged books accountable, arguing that the County Commissioners were "playing politics rather than doing their job," and insisting that the Board of Commissioners replace library staff, implying Ms. Lesley, "with people who have good judgement" instead of having the reputation "of bringing gay porn to kids."

167.    The following week, on September 27, 2021, at a joint meeting of the Board of Commissioners and Library Board, Defendant Faber scolded library staff for not processing the book challenges more quickly and Defendant Shelstad shared his opinion that the library should not be funded: "If that means closing it, then we close it."

168.    On September 29, 2021, Hugh and Susan Bennett, in the attempt to pressure Ms. Lesley into censoring books, sought to press criminal charges against her and have her arrested and prosecuted on the basis of "obscenity and solicitation of minors" and "child abuse."

169.    They brought four books and photocopied pages of *This Book is Gay* to the Campbell County Sheriff's Office as evidence of the "hard-core pornography to children" Ms. Lesley peddled and her "felony behavior." The Campbell County Attorney's Office brought in the Weston County and Prosecuting Attorney's Office to investigate.

170.    At the October 5, 2021, Board of Commissioners meeting, Kevin Bennett claimed the Library Board and Ms. Lesley committed misconduct by "failing to inform the community that a transexual had been booked for child entertainment . . . You can fire the board of directors. You can fire the library director . . . if there is anyone in this room who is against child sexualization, would you please stand? Director Terri Lesley did not stand."

171.    At an October 5, 2021, Board of Commissioners meeting, Susan Bennett admitted that she and her husband would not have accused Ms. Lesley of having committed crimes had she complied with their demands to sensor books and called on the Board of Commissioners to hold Ms. Lesley accountable for her "disrespect to children," who she called victims of "child abuse." She characterized Ms. Lesley's actions as harmful to "victims of child abuse."

172.    At the same meeting, Hugh Bennett asked the Board of Commissioners to fire Ms. Lesley and the Library Board.

173.    At the October 19, 2021, Board of Commissioners meeting, Kevin Bennett held up a sign that said, "FIRE THE DIRECTOR [TERRI LESLEY]."



Campbell County Commissioners 10/19/2021
Tuesday, October 19, 2021

174.    Less than two months after three County Commissioners challenged *This Book is Gay* by Juno Dawson, Defendant Faber appealed CCPLS's decision not to remove the book—intended for young adults—from the Campbell Branch's young adult collection.

### *County Commissioners Publicly Lay Foundation for Anti-LGBTQ+ Appeals*

175.    On October 25, 2021, the Library Board heard Defendant Faber's appeal—the first appeal of a book CCPLS refused to move.

176.    Defendant Faber appealed the decision to keep *This Book is Gay* by Juno Dawson in the Campbell Branch's young adult collection.

177.    Board Member Anderson stated he had a concern with County Commissioners challenging books and appealing those CCPLS chose not to remove. He said it was a conflict of interest because the Board of Commissioners appoints Library Board Members and funds CCPLS.

178.    Defendant Colleen Faber denied the conflict-of-interest concern saying she was not appealing as a County Commissioner.

179.    In her verbal appeal, Defendant Faber mentioned that she was in a rush to submit her challenge, so she handed out three additional pages to the Library Board before speaking.

180.    Instead of *This Book is Gay*, Defendant Faber suggested that young adults read *Passion and Purity: Learning to Bring Your Love Life Under Christ's Control* by Elisabeth Elliot and *Gay Girl, Good God: The Story of Who I Was, and Who God Has Always Been* by Jackie Hill Perry, which describes how the author found God and rejected her former lesbian identity to become straight.

181.    Ms. Lesley replied that CCPLS was happy to look into ordering both suggestions and would have already done so had they been included in the written request.

182.    Defendant Faber attacked *This Book is Gay*, arguing that it "promotes more of a risky and abnormal behavior."

183.    The Library Board denied the appeal and stated their decision was influenced by First Amendment protections and the federal court decision in *Sund v. City of Wichita Falls*, Texas 121 F.Supp.2d 530 (N.D. Texas, 2000).[20]

184.    Throughout this meeting, Kevin Bennett held up a sign that said, "CCPL Knowingly Encourages SEX for Minors and that's a crime."

---

[20] In *Sund*, a city council created a process for moving "objectionable" books from the children's section to the adult section of a library. The court concluded this violated the First and Fourteenth Amendments and a library, "cannot limit access to library materials solely on the basis of the content in those materials, unless the City can demonstrate that the restriction is necessary to achieve a compelling government interest and there are not less restrictive alternatives for achieving that interest." 121 F.Supp.2d at 548.



185.    Two days later, the Weston County and Prosecuting Attorney's Office expressly stated that Ms. Lesley and CCPLS staff were not committing a criminal offense according to any law.

186.    In a letter to the Cambell County Sheriff, Weston County and Prosecuting Attorney's Office declined to pursue any criminal charges.

187.    The County Prosecuting Attorney, Michael Stulken, outlined that the books in question did not meet the legal criteria for being considered "obscene" as defined by Wyoming law and underscored that no other legal grounds existed to support "criminal prosecution for the subject matter in question."

188.    In a comprehensive and well-researched response, the County Attorney emphasized that his office had "devoted considerable amount of time to research the criminal statutes and attendant case law" and personally examined the materials in question. According to his analysis:

a. The materials were not "obscene" as "clearly defined by Wyoming Statute 6-4-301(a)(iii)." Obscenity "requires the material lacks serious literary, artistic, political or scientific value. One would be hard pressed in a criminal prosecution to prove that the materials presented, when applying contemporary community standards and taking them as a whole, appeal to prurient interest. The books in question do not, when applying contemporary community standards, criminally describe sexual conduct in a patently offensive manner and they may have scientific value."

b. He determined, "no other law would provide a basis to institute criminal prosecution for the subject matter in question."

c. His analysis of the content was "in addition to" the fact that the Wyoming crime of promoting obscenity (W.S. § 6-4-302) does not apply to libraries.

d. He concluded, "those who presented these books for public dissemination, viewing, and consumption should not be subject to criminal prosecution."

189.    Despite the unambiguous wording and analysis of the County Attorney's memorandum, Defendants' quest to estrange LGBTQ+ community members and target Ms. Lesley did not cease.

### The Library Board Hears Anti-LGBTQ+ Appeals for Months

190.    At the meeting on  November 22, 2021, the Library Board heard three appeals by one Campbell County resident for books CCPLS declined to remove, including *Mary Wears What She Wants* by Keith Negley. The resident did not seem to have read the books. She mistakenly thought this picture book about Mary Edwards Walker, the first female U.S. Army surgeon and only woman to receive the Medal of Honor was LGBTQ+ themed. The book focuses on Mary as a young girl in the 1800s. Mary was neither transgender nor a lesbian but did famously insist on wearing pants. In protesting the book, the resident described the book as "a breakdown of family" because Mary says, "I'm not wearing boys' clothes . . . I'm wearing my clothes." According to the resident, the most offensive aspect of the story is the final two pages: "Maybe in New York and California it'd be okay, but we live in a cowboy state, and I don't think that the cowboys are really

gonna like seeing a man in a dress or even the drag queens in clubs, so when you're crossing out the boys and girls clothes, that's saying that the boys can wear a dress if they want to and I like I said I don't think cowboys are gonna like that too well."

191.    During the Public Comments Session of that Library Board meeting, several Campbell County residents continued to express explicit anti-LGBTQ+ bias as their rationale for removing books from the children and young adult collection.

192.    The following month, on December 20, 2021, the Library Board heard a joint appeal of a request to remove *TransMission: My Quest to a Beard* by Alex Bertie from two Campbell County residents. Although during public comments the residents stated their objections had "nothing to do with the LGBT adult community," during the appeal, they nevertheless claimed the book "promotes a radical LGBT agenda," and the "radical perversion" of children. They claimed CCPLS "stubbornly" refused to "remove the most vile perverted books." They described the author, a transgender woman who received gender-affirming healthcare, as "a young girl who wants to be a guy" with "a lot of mental issues apparently."

193.    On January 6, 2022, the Board of Commissioners elected Defendant Shelstad as 2022 Chair.

194.    In the first two meetings of 2022, on January 24, and February 28, 2022, the Library Board heard five more appeals of books CCPLS declined to remove—all from Kevin Bennett. His rationale for removing each book included explicitly anti-LGBTQ+ discriminatory language, and one included explicitly racist language.

195.    Kevin Bennett's first appeal on January 24, 2022, for *The Babysitters' Coven* by Kate Williams, included explicitly anti-LGBTQ+ discriminatory and racist language. He complained, "In this library, we see the gay agenda, critical race theory (CRT), and occultism.

CRT and the gay agenda are both in this book. Albeit in a minor capacity, but all you need is one percent rat poison and ninety-nine percent bait and that will kill a rodent. You don't need a lot of poison to poison somebody, so the amount is not the issue. It's that it's there at all."

196.    Hi second appeal that day was to remove *A Quick & Easy Guide to Queer & Trans Identities* by Mady G and Jules Zuckerberg. Again, explicitly anti-LGBTQ+ prejudice against LGBTQ+ people motivated Kevin Bennett's appeal. He called the book "propaganda to brainwash young children," analogizing it to an animated guide of "different kinds of prostitutes and aiming that at kids." He went on, "encouraging the [gender] dysphoria is in effect collaterally encouraging the deaths by despair or suicide," and "to present it before children is child abuse to the point of grooming."

197.    Kevin Bennett's third appeal on January 24, 2022, was to remove *Music from Another World* by Robin Talley, a book about two female pen pals exploring their relationship. As with his other two appeals, Kevin Bennett railed against LGBTQ+ people and the themes of the book, vociferated both in writing and while testifying that, "This book specifically renders bigotry against Christian ideology," promotes "perverse self-direct sexuality against unsophisticated teenage girls," that the book is "in the same category as teaching children how to drink," and that it "grooms teenagers." He also characterized Harvey Milk (the first gay mayor of San Franscisco), to whom one of the characters in the book writes, as a "pedophile predator," a "historically gay rapist," and a "pedophile rapist," analogizing Milk to the deadly cult leader Charlie Manson. He accused the book of "normalizing sexual perversity" and "propaganda."

198.    On February 28, 2022, at the Library Board meeting, Kevin Bennett brought two more appeals. One was for the book *Be Amazing: A History of Pride* by Desmond is Amazing. Kevin Bennett characterized the author as "a mascot used by the gay community to advance the

gay agenda," and claimed that "it's worth pointing out that being yourself was part of the drag queen that was booked by the one percent penny power [referring to the magic show cancelled in July 2021]." He also raged against drag queens, complaining that "the concept of drag is antithetical to being oneself…[and] some sort of addiction," because "men are men. Women are women. Boys are boys. Girls are girls. [And] [t]hey need to be brought up in the way they should go, so that when they're old they won't depart from it." Kevin Bennett expressed hostility towards the LGBTQ+ community, referring to the author and other LGBTQ+ people as pedophiles and claiming library staff was engaged in criminal child abuse, asserting that "we don't want a bunch of pedophiles trafficking little boys like Desmond . . . [who] is being trafficked and used as a mascot and this book itself evidences that. The book tacitly encourages human trafficking and . . . that tacit encouragement extends to those who would include it among the collection's policy. Might as well just mess with the kids themselves. I don't like that. This is a by proxy application of child abuse."

199.    Also at that meeting, notwithstanding the disclaimer that "this is not about gay or straight," Kevin Bennett sought removal of *Sex Plus: Learning, Loving, and Enjoying Your Body* by Laci Green, a general sex-education book that includes a section on LGBTQ+ relationships, claimed library staff was engaged in a "crime" for "knowingly encouraging and/or enticing minor sexuality," that the book "on its cover openly advocates for sodomy using colloquial pictography of the generation it seeks to communicate with. That's grooming propaganda," and describing the book as "unhealthy porn" that "encourages human trafficking."

200.    During the January and February monthly public comments sessions, residents accused Ms. Lesley of "being dishonest," accused her of engaging in criminal misconduct, and

called for her removal, in response to which the Library Board did absolutely nothing to correct the record or protect Ms. Lesley from the harassment and abuse.

  a. In January, Susan Sisti alleged Ms. Lesley and CCPLS staff were endangering children because the CCPLS Collection Development cited to the ALA's best practices, calling the ALA "this radical, now far left, perverted organization, the ALA, and your policy. There's sodomy, foreplay for four-year-olds in our library in this book *Sex is a Funny Word* . . . You're lying to us . . . Terri Lesley, we don't believe you. We want something done. Our children are in danger because of you guys."[21]

  b. In February, Sarah Painter demanded the Library Board "remove Terri Lesley as Director of the Library or force her resignation for repeatedly being dishonest with the citizens of Campbell County."

  201. Activists kept challenging books such as *Gender Queer* by Maia Kobabe, *Lawn Boy* by Jonathan Evison, and *Be Amazing: A History of Pride* by Desmond is Amazing.

  202. At a meeting of the Library Board, Hugh Bennet declared, "You're fighting a losing battle and the longer you resist, the worse it's gonna be."

  203. At the same time as these Library Board meetings were taking place, on February 5, 2022, Dr. Hollie Stewart resigned as Library Board Chair, creating a vacancy on the Library Board for the Board of Commissioners to fill.[22]

  204. By March 1, 2022, Campbell County censorship activists were insisting that the Board of Commissioners appoint "some people that might act in the interest of the community,"

---

[21] Not content to just characterize the ALA as a radical, perverted organization, another resident complained that the ALA would bring about mass death and destruction, resulting in the end of the world, complaining of the ALA that "they're promoting equity, which is just not possible here in the—or shouldn't be possible in the United States . . . And diversity and inclusion, which these are like key words for promoting the LGBTQ agenda, which it is an agenda. Their agenda is to destroy the nuclear family as designed and created by God, an institution established by God of marriage between one man and one woman. And if the nuclear family is destroyed, then our United States will be destroyed. If our United States is destroyed, all nations will fall and thus instituting the rise of the one world order, which will not be good for any of us. People will die under the one world order."

[22] Mr. Anderson served as Interim Library Board Chair.

"the right person," and demanding an explanation for why schools and libraries are exempt from Wyoming criminal statutes with "penalties for individuals who disseminate obscene materials."

205.    At the following Board of Commissioners meeting on March 15, 2022, Susan Sisti provided her version of the timeline since July 2021, misgendering the magician: "We almost have had a county-wide health crisis because of the obscenity and perversion that's been in the library. We discovered it last June when we discovered they were bringing a transgender to do a magic show and the transgender was not background checked and he was going to be allowed to be alone with teenagers in an event called a teen-only show . . . Our library director claimed there were death threats. She's been very dishonest through this . . . They've not removed a single book from the library . . . Matthew Shepherd was not a hate crime. He was killed by his lovers . . . I would like to hear that something's going to happen soon for our children."

206.    Because Ms. Lesley and the Library Board refused to illegally censor books designed for LGBTQ+ individuals under the guise of following the Request Process, Defendants Shelstad and Faber's LGBTQ+ animus became the impetus behind appointing new Library Board members who would facilitate censorship and terminate Ms. Lesley if her resistance to their unlawful discrimination continued.

### *Campbell County Attorney Advises Board of Commissioners about Library Board Appointments and Library Policy*

207.    In April, the Board of Commissioners appointed Sage Bear, the wife of State Representative John Bear, to the Library Board before any candidates were interviewed.

208.    On March 4, 2022, Defendant Shelstad texted Commissioner Bell asking Bell for his thoughts about the impending interviews for now-vacant Library Board position. In particular, he suggested the Board of Commissioners appoint Defendant Bear.

209.    In response, Commissioner Bell emailed Emily S. Williams, a Campbell County Deputy County and Prosecuting Attorney, to inform her that Defendant Shelstad appeared to be violating open meeting laws.

210.    A few days later, on March 7, 2022, Ms. Williams emailed Defendant Shelstad with best practices for Library Board candidate interviews, emphasizing that given all the book challenges, the Board of Commissioners should "pay [ ] special attention to whether a library board candidate will uphold the Library Board By Laws, current policies, statutes, Constitutional law, and other relevant case law will be paramount to avoiding liability and expense."

211.    Williams also discussed the Campbell County Library System's Collection Development Policy, Requests for Reconsideration Policy, and Procedure for Appeals to the Library Board, opining that, "Due to protections for freedom of speech and religion under the First Amendment, the current library policy rejects appeals based on content deemed offensive by a group or individual . . . The recent appeals to the library are based on content which is objectionable to the applicants' personal beliefs . . . relocation of two books is arguably censorship and therefore a violation of policy and the law."

212.    Defendants Shelstad and Faber, however, completely ignored the legal advice and acted to the contrary, notwithstanding Williams' further email advice that:

> …it is extremely important that the interview process not inadvertently discriminate against or be seen to summarily exclude any applicant based on their personal beliefs, standards, connections with any group, organization etc. . . . Interviewing all parties removes the suspicion of potential favoritism and bias by County Commissioners. Also, as you say, because the applicants are likely unaware of current law it is imperative that at a minimum the applicant be made aware of the library policies they will be asked to enforce as a member of the Board. They must understand that their personal opinions- whatever those may be- come secondary to the Board's adopted policies. The Commissioners should do their best to ascertain if any applicant would be unwilling to adhere to the library policies or have biases they could not set aside to perform their responsibilities as a board member. This information may be critical to weed out those who may attempt to

illegally abuse their authority and engage in misconduct which would statutorily require removal and expose the county to liability.

213.    Defendant Shelstad replied that two applicants, including Defendant Bear, had interviewed before the first book challenge and could just be appointed without violating any law, but Ms. Williams protested, explaining that the vacancies were new positions, and from a legal standpoint, investigations into previous candidates were warranted, fair, and reasonable under the law. She further explained that refusing to interview and consider candidates who applied after the book banning push might in and of itself imply unlawful prejudice or bias by the Board of Commissioners.

214.    At the same time as her written communications with Defendant Shelstad, Ms. Williams sent the Board of Commissioners her legal analysis of CCPLS's current policies and a proposed public statement regarding them. Specifically, Williams warned that she and a former county attorney who resigned in November 2021 both came to independent legal conclusions, "censorship attempts are violations of the current policy, and that removal of the Library Director is unfounded, and that litigation regarding censorship – which is waiting in the wings on all sides – would be cripplingly costly, time consuming, and very likely unsuccessful for the County."

215.    She received no response from Defendant Shelstad and was simply told that "he would never support anything in the Memo [she had authored] and said he knew Faber, Maul and Hamm would not either."[23]

---

[23] Williams soon resigned and asked the Wyoming State Bar's Counsel, Mark W. Gifford, to initiate an investigation, primarily into open meetings and open records laws. This is because Williams was aware of documentation provided to certain Commissioners from Defendant Bear's husband, Representative John Bear, advising those Commissioners that they did not have to release text messages regarding county matters as long as they are not sent in "group texts." She believed this to be untrue, and evidence of a clandestine conversation about appointing Representative Bear's wife to the Library Board and to terminate Ms. Lesley.

216.    Furthermore, instead of heeding Ms. Williams' legal advice, Defendant Shelstad interrogated applicants for the vacant Library Board positions about their thoughts on the ALA, specifically guiding the winning answer away from support of the ALA. Each applicant was asked if they were familiar with the ALA, and if they thought the organization was a "good fit for this rural Wyoming community." In public comments at a later monthly public meeting, Defendant Shelstad admitted that, "I think the ALA is a terrible organization. I do. So all of a sudden somebody answers that question the way I want them to. I'm probably going to write that person down as somebody I would pick."

217.    During her interview, Defendant Bear, expressed her opinions that the ALA was "way more liberal than our conservative values here" and inappropriate books should have warning labels.

218.    Defendant Bear did not disclose to anyone on the Board of Commissioners outside of those also in the group prior to her appointment that she participated in the private Facebook group Wyoming MassResistance.

219.    Defendants Shelstad and Faber also did not disclose that fact to any of the other Commissioners.

220.    At the next Board of Commissioners meeting, on April 5, 2022, the Board of Commissioners appointed Defendant Bear to the Library Board.

221.    Susan Bennett thanked the Board of Commissioners for appointing Defendant Bear, stating: "I want to thank you for the good judgment you showed in appointing Sage Bear. I think she'll do a great job and the reason I believe she's qualified is that she hasn't signed on to

this new I guess you would call it the LGBTQAI agenda, the diversity, equity, inclusion talk we're hearing – the DEI agenda." [24]

222.    After she took her seat on the Library Board, Ms. Lesley met with Ms. Bear to bring her to speed on the book banning campaign.

223.    During this meeting, Ms. Bear proposed moving certain books from the children's section to the adult section and also suggested placing warning signs in the library to alert parents about children's access to all of the library's collection.

224.    Ms. Lesley informed Ms. Bear about the legal precedent set in the case of *Sund v. City of Wichita Falls*, 121 F.Supp.2d 530 (N.D. Tex. 2000), which discussed the legal problems with limiting access to books and its potential violation of First Amendment protections.

225.    Additionally, on March 7, 2022, Ms. Lesley shared with Defendant Bear the legal analysis provided by Ms. Williams regarding Campbell County Public Library System's Collection Development Policy, Requests for Reconsideration Policy, and Procedure for Appeals to the Library Board.

226.    Defendant Bear expressed unhappiness with William's analysis.

### *The Board of Commissioners Cuts CCPLS Funding Based on LGBTQ+ Animus*

227.    At about this time, some agitators expressing anti-LGBTQ+ motivations for removing books from the children and young adult collections in the Campbell Branch, if not the entire CCPLS collection, requested funding for that library branch be cut for the same reasons.

---

[24] Although well within her First Amendment rights to express these views, Susan Bennett's comments indicate that she did not genuinely believe Ms. Lesley or any other library staff had violated Wyoming criminal statutes or were engaged in child or sexual abuse. Instead, Ms. Bennett shows she was pursuing her political and ideological objectives, aiming to remove individuals she saw as obstacles to her discriminatory agenda and censorship campaign and eliminating access to diverse, LGBTQ+, and racially equitable literature, content, and voices.

228.    Kevin Bennett and his group advocated for the Board of Commissioners to cut funding "because for eleven months we've asked library staff to simply move the books into the adult section of the library and for eleven months, they have refused and lied in order to push their perspective."

229.    Kevin Bennett, Susan Bennett, Hugh Bennett and other censorship advocates complained that funds were going to "sexualizing children," to "propaganda" about the "rainbow lifestyle," to "prurient sexual propaganda" and "pornography," and in support of pushing the "transexual movement" and "trans agenda." They called the challenged books "poison," and accused Ms. Lesley and other CCPLS staff of being "dishonest" and "liars."

230.    Instead of protecting Ms. Lesley or pushing back against such characterization, Defendant Shelstad admitted that he had been "pretty vocal about this at the beginning. . . our job is to appoint board members . . . we were elected by our constituents to do their will in this county."

231.    On May 13, 2022, the Board of Commissioners cut what is known as the "Penny Tax," 41% of the funds for youth books and programs from CCPLS's budget.

232.    Defendant Shelstad conceded that the funds were cut in retaliation for their protected activities and First Amendment stance, even though all legal opinions the Board of Commissioners and Library Board obtained supported Ms. Lesley's position.

233.    As a result of the funding cut, approximately $32,600 was withheld from the children's section of the Campbell Branch.

234.    Kevin Bennett expressed gratitude to the Board of Commissioners for cutting the funding.

235. As evidence of the underlying discriminatory animus, Kevin Bennett stated that the country needed kids to grow up and "be part of successful families," as opposed to what he called "these rainbow lifestyles."

236. Kevin Bennett regarded the removal of funding as the "tamest slap on the wrist" and stated his hope that it would motivate the library system to make better decisions on its own.

237. Ms. Lesley and Interim Library Board Chair, Charlie Anderson attended a Board of Commissioners meeting in their capacity as private citizens and residents of Campbell County.

238. Ms. Lesley sat alongside other residents who opposed the funding cut to reconsider their decision, emphasizing that the cut would unfairly impact children.

239. The Board of Commissioners did not reverse the funding cut for the Campbell Branch.

240. At the budget hearing on June 20, 2022, the Board of Commissioners reinstated some funds to the Wright Branch, but none to the Campbell Branch.

241. Protestors, including Kevin Bennett, had pushed for Wright Branch to retain its funding because, unlike the Campbell Branch, the Wright Branch did not have "bad books" in its collection.

### The Board of Commissioners Continues Appointing Board Members in an Illegal Manner

242. Two vacancies on the Library Board were created to be filled on July 6, 2022:

   a. Ms. Miller-Finn did not apply for a second term.

   b. Ms. Stovall had served the two-term limit.

243. Defendant Shelstad continued to ask Library Board applicants the same question about their thoughts on the ALA.

244. Defendant Faber also interrogated candidates about their "community values."

245.     Given the context of her actions over the previous year, Defendant Faber chose to employ this facially neutral "community standards" language to identify candidates who would unlawfully engage in anti-LGBTQ+ discriminatory censorship.

246.     On July 6, 2022, the Board of Commissioners appointed Defendants Butler and Collier to fill the Library Board's two vacancies.

247.     Defendant Collier did not disclose to anyone on the Board of Commissioners outside of those also in the group prior to her appointment that she participated in the private Facebook group Wyoming MassResistance.

248.     Defendants Shelstad, Faber, and Bear also did not disclose that fact to any of the other Commissioners.

249.     On July 25, 2022, Ms. Steward also resigned from the Library Board, stating personal reasons.

250.     On August 2, 2022, without holding the newly created vacancy open for applications, the Board of Commissioners appointed Defendant Lyon to the Library Board.[25]

251.     Defendant Shelstad explained that instead of utilizing the usual appointing procedures, the Board of Commissioners simply called remaining applicants from the previous vacancies.

252.     Between April and August 2022, the Board of Commissioners had appointed four new members to the five-member Library Board.

253.     In August 2022, the Library Board consisted of four new members and Mr. Anderson:

---

[25] This decision was directly against Ms. Williams' advice in March 2022 that each new vacancy required a new application process.

    a.   Defendant Bear (Chair), owner of a flower farm and dry cleaners;

    b.   Defendant Butler, retired;[26]

    c.   Defendant Collier, elementary school teacher;

    d.   Defendant Lyon, instructional aide at an elementary school; and,

    e.   Mr. Anderson (whose second three-year term would expire in July 2024), interim judge overseeing the Municipal Court for the City of Gillette since early 2023.

254.    Around this time, the Wyoming Library Association ("WLA") invited Ms. Lesley to speak at its Annual Conference on September 28-30, 2022.

255.    Prior to the conference, members of the new Library Board asked Ms. Lesley what she would be speaking about at the conference.

256.    Ms. Lesley informed the Library Board that she would be speaking about book bans, specifically  focusing on her experience from June 2021 through the spring of 2022.

257.    During the conference, CCPLS won the WLA's Outstanding Library Award.[27]

258.    On September 30, 2022, Ms. Lesley presented on the events surrounding the book challenges and advocated for the First Amendment.

259.    After her presentation, the Children's Director, Darcy Acord, presented about the impact of the book challenges and stress on CCPLS staff.

260.    Defendants Bear and Butler attended these presentations and sat with Denton Knapp, Campbell County Commissioners Administrative Service Director.

---

[26] Defendant Butler was temporarily employed at Defendant Bear's dry-cleaning company from October 18, 2022, to February 27, 2023. This is discussed later as a conflict of interest that caused the Library Board to re-vote on the decision to revise the CCPLS Mission Statement.

[27] https://library.wyo.gov/wla-announces-winners-of-its-2022-awards-and-grants/

261.    During the WLA conference, Defendant Bear expressed to Ms. Knapp that she intended to revise the Collection Development Policy with respect to how books were selected and retained at CCPLS.

262.    She further stated that once those changes were made, she intended to fire Ms. Lesley.

263.    By the following month, the new Library Board disassociated from the ALA and added Defendant Faber's "community values" language to the CCPLS Mission Statement.

### *The Library Board Revises the CCPLS Mission Statement and Leaves ALA Despite Drastic Loss of Funding*

264.    The CCPLS mission statement originally read: "Our mission is to provide diverse cultural opportunities for reading, learning and entertainment to all citizens of our community. We lead the way to a universe of information with personal service and technology."

265.    But, in furtherance of their discriminatory agenda, the Board of Commissioners sought to revise the mission statement now that they had appointed an almost completely new, and much more complicit, Library Board.

266.    Unhappy with Ms. William's analysis, Defendant Bear sought a second opinion from private counsel Nick Norris of Lubnau Law Firm.

267.    She requested a legal opinion on two matters: moving specific children's books labeled as "objectionable" from the children's section to the adult section of the library, and the possibility of adding "community standards language" to the library system's mission statement.

268.    In a legal memorandum dated October 13, 2022, Mr. Norris answered two questions for the Library Board, including, specifically, "May the Library Board add the language 'while upholding community standards' to their mission statement?"[28]

269.    The legal analysis from Mr. Norris advised against relocating specific children's books, stating that it would violate the First Amendment.

270.    Mr. Norris advised the Library Board against modifying the mission statement as proposed "because it will expose the Library to undue legal scrutiny, and, in application, will undoubtably lead to violations of First Amendment protections."

271.    Mr. Norris warned, "Adding 'community standards' to the mission statement provides the potential complainant evidence to support a First Amendment claim and a reason for the court to scrutinize policy . . . if the library carries out the revised mission and restricts access to certain content to 'uphold community standards' it will be in violation of First Amendment protections."

272.    The analysis quoted the *Sund* case but went on to say:

It should be noted that *Sund* is not binding authority in Wyoming, however, the Tenth Circuit, which is binding here adopted reasoning from *Pico* in *Case v. Unified School District* #233 908 F. Supp 864 (D. Kan. 1995). The plurality went on to hold that, "local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.' In short, the Library will violate the First Amendment if it relocated children's books deemed objectionable from the children's section to another section of the library.

---

[28] The other question was whether CCPLS could remove specific children's books deemed "objectionable" from the children's section to the adult section. Mr. Norris advised that "moving books with a target market of children, which the Library Board finds objectionable (for whatever reason)" is "presumptively unconstitutional." In his explanation, Mr. Norris also cited U.S. Supreme Court language: "Clearly all nudity cannot be deemed obscene even as to minors." *Ginsberg v. New York*, 390 U.S. 629 (1968). He specified the seeming unlikeliness that "the books identified by the Library Board" would be found to be legally "obscene as to children."

273.    The analysis also indicated that while adding "community standards" language to the mission statement was not a direct First Amendment violation, it was "not advisable" and could lead to legal scrutiny.

> The act of changing the mission statement will not in and of itself cause any harm or cause a First Amendment violation. However, the act of restricting access to certain books in a public library based upon "community standards" almost certainly would cause First Amendment violations.

274.    Ms. Bear expressed her disappointment with Mr. Norris' response and vowed to seek "other counsel."

275.    In addition to the Library Board, this memorandum was sent to Defendant Shelstad, among others.

276.    Against this advice, on October 24, 2022, the Library Board revised the CCPLS Mission Statement to the following: "Our mission is to provide diverse cultural opportunities while reflecting community standards. We strive to provide diverse cultural opportunities for reading, learning, and entertainment to all citizens of our community. We lead the way to a universe of information with personal service and technology."

277.    On October 24, 2022, the Library Board also heard public comments about their proposal to disassociate from the ALA, which was "committed to serving the information needs of the LGBTQIA+ professional library community, and the LGBTQIA+ information and access needs of individuals at large. We are committed to encouraging and supporting the free and necessary access to all information."[29]

---

[29] https://www.ala.org/rt/srrt/about-srrt.

278.    Those who spoke in favor of disassociating from the ALA complained about "gay marriage" and "pride," and vociferated against "sexualizing children," "homosexual books," the "LGBTQ agenda," and "perverting kids."

279.    Although more residents at the public meeting spoke in support of maintaining association with the ALA than those who spoke in support of disassociating from the ALA, the Library Board voted 4:1 to disassociate from the ALA.

280.    Around this time, Ms. Lesley attended the Wyoming State Library's Directors Workshop and relayed to the other directors about what was happening in Campbell County. She felt the need to help her colleagues, people she collaborated with and considered friends, prepare for similar attacks on their libraries.

281.    At a joint meeting between the Board of Commissioners and Library Board, on December 6, 2022, Mr. Anderson reminded the Board of Commissioners that restricting books from their intended audience is censorship, that he sent them a copy of the previously-mentioned *Sund* opinion, and that he wrote them a memo about it: "*Sund* is the case in which they did some of the things being talked about. These standards apply to everybody."

282.    On January 4, 2023, the Board of Commissioners elected Defendant Faber as 2023 Chair.

283.    The Library Board began holding workshops to revise the CCPLS Collection Development Policy in January 2023, systematically eliminating all references to the ALA.

284.    At one workshop, on January 5, 2023, Kyle Ferris, a Campbell County Deputy County and Prosecuting Attorney and former Library Board member, reminded the Library Board that First Amendment protection is not only for the majority of the community - it is for the entire community and would protect content over which two average adults would disagree.

285.    Board Member Anderson reminded the Library Board that the Weston County and Prosecuting Attorney's Office said the materials were not obscene and argued that language from the Children's Internet Protection Act (CIPA) that Defendant Bear wanted to include was not relevant for books.

286.    At another workshop on February 27, 2023, Defendant Bear mentioned she had been working with what she referred to as a "law firm." She was referring to Liberty Counsel, an organization she had wanted to utilize to draft library policies, and with whom she had reached an agreement to defend it if it is challenged in court.[30]

287.    At another workshop on March 9, 2023, the Library Board worked through the Liberty Counsel's version of the Collection Development Policy, which Mr. Anderson referred to as "a radical departure from everything we talked about before."

288.    On April 3, 2023, Mr. Ferris emailed the Library Board and others with a copy of the court opinion in *Little v. Llano County* (5th Cir. 2023) with his analysis that the decision regarded "similar matters before our board" and was "not favorable to our position with regard to the proposed policy changes."

289.    In *Little*, a district court judge in Texas enjoined the removal of books, many of which targeted LGBTQ+ content and content written about people of color, from the shelves of the Llano County Library System, othering them to be returned to the shelves.

---

[30] According to its website, "Liberty Counsel is a Christian ministry that proclaims, advocates, supports, advances, and defends the good news that God in the person of Jesus Christ paid the penalty for our sins and offers forgiveness and eternal life to all who accept him as Lord and Savior. Every ministry and project of Liberty Counsel centers around and is based upon this good news, which is also referred to as the gospel. Our mission statement is: 'Restoring the culture by advancing religious freedom, the sanctity of human life and the family.' . . . Our comprehensive worldview provides the foundation for every affiliated ministry, program, and project." https://lc.org/about-liberty-counsel.

***The Library Board Terminates Ms. Lesley and Revises CCPLS Collection Development Policy***

290.    On June 8, 2023, the Library Board held a Special Board Meeting. During the meeting, the Library Board approved highly subjective revisions to the Collection Development Policy.

291.    In addition to no longer including any references to the ALA, the new Collection Development Policy included language from CIPA, involved the Library Board earlier in the Request Process, and allowed books to be re-challenged after three years.

292.    Given the context, Ms. Lesley became immediately concerned that CCPLS would wield the vague and entirely subjective criteria in the new Collection Development Policy to censor books designed for LGBTQ+ individuals.

293.    At the June 26, 2023, Library Board meeting, Ms. Lesley also publicly reported that one percent tax funds were approved for the Wright Branch but not the Campbell Branch. The reason for this was because Defendant Shelstad declined to restore the one percent tax funds until the challenged books were removed from the children and young adult collection.

294.    At the meeting, two Campbell County residents complained again about the book *Sex is a Funny Word*, describing it as "repulsive," "obscene," "perverted," and "sexually explicit."

295.    *Sex is a Funny Word*, was amongst the book titles the Weston County and Prosecuting Attorney's Office said was not obscene under Wyoming law.

296.    After that, Defendant Bear asked Ms. Lesley for an update on removing the books. Ms. Lesley said that no new challenges had taken place since the new Collection Development Policy was approved, and Defendant Sage warned her, "There are a few titles that we're all very

aware of and . . . I guess if you want them challenged we can certainly send the word out and I can start challenging them . . . How do you plan on handling this?"[31]

297.    At the July 24, 2023, Library Board meeting, the Library Board elected the FY 2023/24 officers: Defendant Butler (Chair), Defendant Collier (Vice Chair), and Mr. Anderson (Treasurer).

298.    Also, Defendant Bear asked Ms. Lesley again to move "certain books that are pretty obvious," "the egregious stuff," "that's easily meant more for an adult audience," "sexually explicit" using the weeding process.

299.    When Ms. Lesley opposed doing so and reminded Defendant Bear that doing so would be discriminatory and a violation of the First Amendment, Defendant Bear responded, "Well, if that's the way you feel then I feel like you should find another job."

300.    Defendant Collier added that she wanted to set the librarians on a path to purge the collection in the library, confirming, "That is what I want them to do."

301.    Defendant Bear insisted that librarians "need to be willing to look at that harmful to children policy and make a decision," "can weed stuff that's easily meant more for an adult audience," and "should be able to figure out what is sexually explicit and keep it away from minors." And although the book had never been challenged before, Defendant Bear referred to the book *Tricks* by Ellen Hopkins as a title that needed removal.

---

[31]  Notably, in another similar pattern across the county, the same individuals protesting LGBTQ+ themed books and authors, seeking to marginalize and suppress those voices, also took issue and challenged books including racial content or written by authors of color. For example, during public comments at the June 26, 2023, Library Board meeting, one censorship advocate complained about *Not My Idea: A Book about Whiteness* by Anastasia Higginbotham, calling it "very clearly a racist book, undeniably racist against white people . . . I don't think it's a good idea to have a book that makes people feel bad about being white or makes people look down at other people for being white, which I think this book does."

302.    Ms. Lesley responded that *Tricks* was a book specially meant for young adults and that limiting it to the adult collection because of its content would violate the First Amendment. Ms. Lesley reiterated that CCPLS needed to consistently follow a structure when determining challenges to books or CCPLS could face legal liability.

303.    Following Public Comments, Defendant Collier insisted, "I want to make a motion that at the next meeting that there is some sort of report on the books and movement of books . . . I want to see that our policy did something."

304.    Four days later, the Library Board terminated Ms. Lesley, citing her opposition to removing books.

305.    On July 27, 2023, Ms. Lesley was scheduled to meet with Defendant Butler to discuss weeding library books.

306.    Instead, Defendant Bear joined the meeting. She and Defendant Butler asked Ms. Lesley to resign because she refused to remove unspecified books. They did not identify a particular book.

307.    Ms. Lesley refused to resign and asked for a public hearing.

308.    The following day, on July 28, 2023, the Library Board held a public hearing. A vast majority of community members advocated in support of Ms. Lesley keeping her position as Executive Director. Among the few individuals opposing her, the usual pattern emerged. Opponents complained that "People need to move the books that are inappropriate for kids," children should not be exposed to materials that "sexually excite them or lead them down a path to sexual addiction," and the books being challenged were "dangerous to children."

309.    The Library Board closed public comments because a community member in support of Ms. Lesley called the public meeting a "shit show."

310.    The Library Board then went into Executive Session.

311.    Upon its return, the Library Board announced the decision to terminate Ms. Lesley in a 4:1 vote—Defendants Bear, Butler, Collier, and Lyon vote to terminate Ms. Lesley.

312.    After her termination, in a subsequent public meeting, the Library Board discussed the job description for the vacant Executive Director position, including eliminating "ALA ideology" and "indoctrination."

313.    In the spring of 2024, Defendant Butler asked the new CCPLS Executive Director John Jackson to create a special section in the library and move challenged LGBTQ+ content to that section, segregated from the rest of the library, without the materials first going through the Request Process.

314.    Defendant Butler did this in collaboration with and at the behest of censorship activists and without a Library Board vote.

315.    Defendant Butler stated in April 2024 at a public meeting that he took "full blame" for moving the books.

316.    Library Board Member Charlie Anderson opposed the measure, arguing that "[i]f you're moving the books to where somebody can't find it, you're censoring that book, you're violating the kid's constitutional right to information."

317.    Mr. Jackson similarly stated it was "it was not my decision to move the books."

*Terri Lesley Continues to Suffer the Consequences of Defendants' Unlawful Conduct*

318.    Defendants have caused Ms. Lesley significant emotional distress and suffering.

319.    Defendants deprived Ms. Lesley of the full financial benefit of employment with CCPLS and of the honor of retiring with distinction from the library she loyally served for nearly three decades.

320.    Ms. Lesley suffered from anxiety, insomnia, and extreme stress.

321.    Defendants made the last two years of her life pure hell.

322.    Since her termination, Ms. Lesley has been unable to recover analogous employment in the field she dedicated her career to and loved.

### CLAIMS FOR RELIEF

**FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF**
**42 U.S.C. § 2000e** *et seq.*
**Discrimination, Retaliation, and Anticipatory Retaliation on the Basis of Sex in Violation**
**of Title VII of the Civil Rights Act of 1964**
**(Against Government Entity Defendants)**

323.    Ms. Lesley hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

324.    Ms. Lesley alleges discrimination claims under Title VII of the Civil Rights Act of 1964, including association, advocacy, and retaliation (including anticipatory retaliation), on the basis of sex (including sexual orientation and gender identity).

325.    Title VII protects those employees, whether public or private, who oppose discriminatory practices, even if the opposition is "based on a mistaken good faith belief" that Title VII was violated. *Crumpacker v. Kan. Dep't of Hum. Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003). To "oppose" an unlawful employment practice is to "antagonize . . .; contend against; . . . confront; resist; [or] withstand" it. *Crawford v. Metro Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009).

326.    Title VII "protects individuals who, though not members of a protected class, are victims of discriminatory animus toward [protected] third persons with whom the individuals associate." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009); *see also Sines v. Kessler*, 558 F. Supp. 3d 250 (W.D. Va. 2021) (finding Charlottesville rally participants presented

sufficient evidence of defendant white supremacy group members' generalized desire to commit racial violence to survive summary judgement).

327.    "Individuals are also protected from discrimination because of their advocacy on behalf of protected class members." *Barrett*, 556 F.3d at 513.

328.    Where a public employee opposes discriminatory practices, associates with protected classes, and/or advocates on behalf of protected classes, protected characteristics are "imputed" to the public employee. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 575 (6th Cir. 2000).

329.    Finally, the law also protects individuals who make it reasonably apparent that they will continue engaging in protected opposition, advocacy, and/or association. Specifically, because "[a]ction taken against an individual in anticipation of that person engaging in protected opposition to discrimination is no less retaliatory than action taken after the fact," courts have held that "this form of preemptive retaliation falls within the scope of 42 U.S.C. 2000e-3(a)." *Sauers v. Salt Lake County*, 1 F.3d 1122, 1128 (10th Cir. 1993); *see also E.E.O.C. v. Bank of Okla.*, No. 03-CV-0657-CVE-PJC, 2005 WL 7870754, at *5 (N.D. Okla. Jan. 18, 2005); *E.E.O.C. v. Cognis Corp.*, No. 10-CV-2182, 2012 WL 1893725, at *2 (C.D. Ill. May 23, 2012).

330.    Among other acts of discrimination and retaliation alleged herein, Defendants were overwhelmingly hostile and harassing towards Ms. Lesley and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. Lesley's employment.

331.    Defendants' discriminatory animus towards protected classes was a motivating factor of Defendants' adverse actions against Ms. Lesley, and their retaliatory animus was the but-for causation for the same.

332.    Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Lesley's federally protected rights.

333.    As a result of Defendants' conduct, Ms. Lesley suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**FOURTH, FIFTH, AND SIXTH CLAIMS FOR RELIEF**
**Violations of the Equal Protection Clause of the Fourteenth Amendment**
**Brought Through 42 U.S.C. § 1983**
**Discrimination/Retaliation/Anticipatory Retaliation on the Basis of Sex, Sexual Orientation, and/or Gender Identity**
**(Against All Defendants)**

334.    Ms. Lesley hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

335.    At all times relevant to this claim, Defendants were acting under color of state law.

336.    At all times relevant to this claim, Ms. Lesley enjoyed federal rights to oppose discriminatory practices against protected LGBTQ+ individuals; associate with protected classes; advocate on behalf of protected classes; and made it reasonably apparent that she engaged in such protected conduct or would do so in the future.

337.    Like Title VII, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects individuals who oppose discriminatory practices against, advocate on behalf of, and associate with protected classes. Likewise, the Equal Protection Clause protects individuals who make it reasonably apparent that they will continue to engage in such protected activities.

338.    The Equal Protection Clause recognizes sex as a protected class. With respect to sex, the Supreme Court in *Bostock v. Clayton County, Georgia* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex . . . ." 590 U.S.

644, 679 (2020); *see also Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause"); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576-77 (6th Cir. 2004) (same).

339.    As alleged herein, Defendants had final policymaking authority from Defendant Campbell County when they discriminated against, retaliated against, and engaged in anticipatory retaliation against Ms. Lesley because of her opposition to sex-based discriminatory practices, her associated with and advocacy on behalf of a protected class, and the expectation that she would continue engaging in such protected activities in the future.

340.    As alleged herein, Defendants Shelstad, Faber, Bear, Butler, Collier and Lyons were an affirmative link and a causal connection to the discrimination, retaliation, and anticipatory retaliation carried out by the final policymakers.

341.    Defendants Shelstad, Faber, Bear, Butler, Collier and Lyons had control of employment and operational decisions within CCPLS and intentionally exercised that control to discriminate and retaliate against Ms. Lesley.

342.    At all times relevant to this claim, it was clearly established that supervisors, commissioners and board members could not deny an employee's right to equal protection under the laws of the United States by discrimination and retaliating against employees on the basis of their sex-based opposition, advocacy, and association. Any reasonable supervisor, commissioner or board member acting under color of state law knew or should have known of these clearly established rights.

343.     Among other acts of discrimination and retaliation alleged herein, Defendants were overwhelmingly hostile and harassing towards Ms. Lesley and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. Lesley's employment.

344.     Defendants' discriminatory animus towards sexual and gender minorities and Ms. Lesley's protected activities were the but-for cause of Defendants' discrimination and retaliation.

345.     Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Lesley's federally protected rights.

346.     As a result of Defendants' conduct, Ms. Lesley suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**SEVENTH AND EIGHTH CLAIMS FOR RELIEF**
**Violations of the First Amendment, Brought Through 42 U.S.C. § 1983**
**Discrimination and Retaliation against Protected Speech and Association**
**(Against All Defendants)**

347.     Ms. Lesley hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

348.     At all times relevant to this claim, Defendants were acting under color of state law.

349.     At all times relevant to this claim, Ms. Lesley enjoyed the First Amendment rights to access and receive information and ideas of all protected viewpoints; engage in speech on matters of public concern; be free from state action that deters, and chills protected speech; and to associate freely.

350.     At all times relevant to this claim, Ms. Lesley was entitled to oppose unconstitutional censorship, without reprisal.

351.     As alleged herein, Ms. Lesley opposed, spoke out against, and refused to comply with unlawful and unconstitutional censorship, both privately and publicly.

352.    As alleged herein, Ms. Lesley spoke outside of her official duties by privately attending board meetings and community events. During these appearances she advocated against censorship, book bans, and tax cuts to library services.

353.    Ms. Lesley was not responsible for making determinations about freedom of speech and the unlawfulness of CCPLS's removal, segregation of, and censorship of categories of books, nor was she responsible for policymaking decisions regarding the library collection including the removal and censorship of categories of books.

354.    As a public employee, Ms. Lesley's job duties did not (nor could they) include systematic suppression of the First Amendment rights of library patrons by censoring books based on disfavored content or their association with historically marginalized minority groups.

355.    Ms. Lesley's critiques of Defendants and their restrictions on speech and association were outside the scope of her job duties.

356.    Ms. Lesley's speech on these subjects did not contribute to or facilitate her performance of duties at CCPLS.

357.    The suppression of speech and association in public libraries is also a matter of public concern.

358.    As alleged herein, individual Defendants had final policymaking authority from Defendant Campbell County when they retaliated and discriminated against Ms. Lesley intending to chill and deter her protected speech and association.

359.    As alleged herein, individual Defendants were an affirmative link and a causal connection to the discrimination and retaliation carried out by the final policymakers.

360.    Individual Defendants had control of employment and operational decisions within CCPLS and exercised that control to discriminate and retaliate against Ms. Lesley.

361.    Specifically, Defendants engaged in viewpoint discrimination and retaliation, that is, they engaged in censorship based on their disagreement with the *content* of Ms. Lesley's protected speech and association. Viewpoint discrimination is presumptively unconstitutional and subject to strict scrutiny.

362.    At all times relevant to this claim, it was clearly established that supervisors, commissioners, and board members could not discriminate and retaliate against public employees who engage in protected speech and association because of disagreements with their viewpoints. Any reasonable supervisor, commissioner or board member acting under color of state law knew or should have known of these clearly established rights.

363.    Among other acts of discrimination and retaliation alleged herein, Defendants were overwhelmingly hostile and harassing towards Ms. Lesley and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. Lesley's employment.

364.    Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Lesley's federally protected rights.

365.    The value of Ms. Lesley's speech outweighed any legitimate governmental interest. Indeed, Defendants' discrimination and retaliation against Ms. Lesley was intentional, in reckless or callous disregard for her federally protected rights, and not in furtherance of any legitimate governmental interest.

366.    As a result of Defendants' discrimination and retaliation, Ms. Lesley suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**NINTH CLAIM FOR RELIEF**
**Violations of 41 U.S.C. § 1985(3)**
**Conspiracy under the Ku Klux Klan Act**
**(Against Individual Defendants)**

367.    Ms. Lesley hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

368.    Although not necessary for a § 1985 claim, at all times relevant to this claim, Individual Defendants were acting under color of state law.

369.    Individual Defendants conspired with each other and with community members.

370.    Section 1985(3) prohibits when "two or more persons in any State or Territory conspire…for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws[.]"

371.    Ms. Lesley brings this claim under both the "deprivation" clause and the "hindrance clause" of section 1985(3) in that Defendants conspired both to deprive a person or class of persons equal privileges and protection of the law as described above and conspired for the purpose of preventing or hindering Ms. Lesley from securing the same to all persons within the state.

372.    At all times relevant to this claim, Ms. Lesley enjoyed those rights previously alleged, including the rights to equal protection under the laws of the United States and the rights to oppose discriminatory practices, advocate and associate with LGBTQ+ constituents, and to engage in protected speech pursuant to the First Amendment.

373.    As alleged herein, Individual Defendants plotted, coordinated, and executed a common plan with each other to engage in discrimination, retaliation, obstruction, intimidation, and threats against LGBTQ+ community members in violation of the Fourteenth Amendment, and

Ms. Lesley by association and advocacy for them, and to remove similarly themed or content-including books from the library system, in violation of Ms. Lesley's and the community's First Amendment rights.

374.    As alleged herein, in furtherance of their conspiracy to deprive Ms. Lesley and others of equal protection or equal privileges and immunities under the First and Fourteenth Amendments, Defendants acted on class-based animus and engaged in acts of intimidation, threats, discrimination, and retaliation.

375.    As alleged herein, together, Defendants committed overt acts in furtherance of the conspiracy to violate Ms. Lesley's First and Fourteenth Amendment rights, including, but not limited to, falsely accusing Ms. Lesley's protected activities as subjecting minors to pornography, perversion, and other criminal misconduct and ultimately terminating Ms. Lesley's employment.

376.    As alleged herein, together, Defendants conspired to prevent and hinder Ms. Lesley from giving or securing to all patrons of CCPLS their constitutional rights and equal protection of the law.

377.    Individual Defendants undertook the illegal activities described above as overt acts pursuant to an unlawful conspiracy, the purpose of which was to bother hinder Ms. Lesley in giving or securing to all persons equal protection of the laws, and to oppress, harass, and stigmatize LGBTQ+ community members in violation of the Fourteenth Amendment, and through them Ms. Lesley; and to unlawfully remove, segregate, and censor books with disfavored content based on prejudices in violation of the First Amendment rights guaranteed by the Constitution and laws of the United States.

378.    The conspiracy was motivated by a class-based invidious discriminatory animus.

379.    The conspiracy was aimed at interfering with rights that by definition are protected against private, as well as official, encroachment.

380.    Individual Defendants undertook the illegal activities described above in furtherance of their personal animus towards LGBTQ+ community members.

381.    At all times relevant to this claim, it was clearly established that supervisors and board members could not engage in conspiracies to deprive public employees of these rights. Any reasonable supervisor or board member acting under color of state law knew or should have known that such conspiracies were clearly unlawful.

382.    As a result of Defendants' conduct, Ms. Lesley suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**TENTH CLAIM FOR RELIEF**
**Violations of the First Amendment Establishment Clause**
**Brought Through 42 U.S.C. § 1983**
**Government Endorsement and/or Favoring of One Religion**
**Over Other Religions or Non-Religion**
**(Against All Defendants)**

383.    Ms. Lesley hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

384.    At all times relevant to this claim, Defendants were acting under color of state law.

385.    The Establishment Clause prohibits government actions that endorse or favor any particular religion or religious beliefs in general.

386.    Public benefits may not be shaped by religious beliefs in a manner that shows preference for any particular religion or religious beliefs in general.

387.    Public library collections, such as the CCPLS collection, are public benefits.

388.    Defendants acted to shape the CCPLS collection in a way that that endorsed or favored one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

389.    As alleged herein, Defendants Campbell County, Board of Commissioners, Shelstad, and Faber wanted Ms. Lesley and the Library Board to make CCPLS collection decisions that endorsed or favored one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

390.    When Ms. Lesley and the Library Board refused to do so, Defendants Campbell County, Board of Commissioners, Shelstad, and Faber appointed Defendants Bear, Butler, Collier, and Lyon to the Library Board to revise the CCPLS Collection Development Policy and terminate Ms. Lesley so that collection decisions would endorse or favor one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

391.    Defendants Library Board, Bear, Butler, Collier, and Lyon revised the CCPLS Collection Development Policy and terminated Ms. Lesley so that collection decisions would endorse or favor one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

392.    At all times relevant to this claim, the First Amendment protected Ms. Lesley from government actions that endorsed or favored one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

393.    As alleged herein, Defendant Board of Commissioners had final policymaking authority from Defendant Campbell County when it appointed Defendants Bear, Butler, Collier, and Lyon to the Library Board in furtherance of their ultimate goal that collection decisions would

endorse or favor one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

394.    As alleged herein, Defendants had control of employment and operational decisions within CCPLS and exercised that control to ensure collection decisions would endorse or favor one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

395.    At all times relevant to this claim, it was clearly established that public library collection decisions may not be shaped by religious beliefs in a manner that shows preference for any particular religion or religious beliefs in general. Any reasonable Commissioner or Library Board member acting under color of state law knew or should have known of these clearly established rights. In fact, multiple attorneys informed the Board of Commissioners and Library Board of these clearly established rights.

396.    Defendants terminated Ms. Lesley's employment so that collection decisions would endorse or favor one denomination of Christianity over other Christian denominations, other religious beliefs, and/or over non-religious beliefs.

397.    Defendants' termination of Ms. Lesley violated the Establishment Clause.

398.    Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Lesley's federally protected rights.

399.    The value of Ms. Lesley's rights under the Establishment Clause outweighed any legitimate governmental interest. Indeed, Defendants' violation of the Establishment Clause was intentional, in reckless or callous disregard for Ms. Lesley's federally protected rights, and not in furtherance of any legitimate governmental interest. *See Epperson v. State of Ark.*, 393 U.S. 97,

107 (1968) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505 (1952)) ("the state has no legitimate interest in protecting any or all religions from views distasteful to them").

400. As alleged herein, Defendants' actions were based on the religious views of some Campbell County residents.

401. As a result of Defendants' violation of the Establishment Clause, Ms. Lesley suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including but not limited to the following:

a. All declaratory relief and injunctive relief, as appropriate;

b. Actual economic damages, including but not limited to back pay, font pay, and lost benefits, as established at trial;

c. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

e. Punitive damages for all claims as allowed by law, to the maximum amount permitted and in an amount to be determined at trial;

f. Prejudgment and post-judgment interest at the highest lawful rate;

g. A tax-offset;

h. Attorneys' fees and costs; and

h. Such further relief as justice requires, including injunctive relief against all Defendants to cease and desist from discrimination, retaliation, and censorship in the operations of the Campbell County Library System.

Dated: April 21, 2025

Respectfully submitted,

*/s/ Qusair Mohamedbhai*
Qusair Mohamedbhai
Iris Halpern*
Azra Taslimi*
Stephanie Wise*
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
qm@rmlawyers.com
ih@rmlawyers.com
at@rmlawyers.com
sw@rmlawyers.com;
*Attorneys for Plaintiff*
*\* Pro Hac Vice Application Pending*